People of the State of Illinois, Plaintiff-Appellee, v. Ronald A. Novak, Defendant-Appellant.

Gen. No. 64–122.

Second District.

October 25, 1965.

Rehearing denied November 29, 1965.

Ronald A. Novak, pro se, of Joliet, plaintiff in error.

William V. Hopf, State's Attorney, Anthony M. Peccarelli and Edgar J. Elliott, Assistant State's Attorneys, all of Wheaton, for defendant in error.

MR. JUSTICE MORAN delivered the opinion of the court.

The defendant, Ronald Novak, was convicted of the crime of burglary. His appeal has been transferred to this Court by the Supreme Court.

On September 16, 1962, the Deeter family of Oak Brook, Illinois, locked up their home and went to the polo games. When they returned some hours later, they found a Volkswagon bus parked in their driveway with the front end facing the street and the motor running. One Joanne Hogrewe was seated behind the wheel of the Volkswagon. Mr. Deeter parked his car in front of the Volkswagon, thereby blocking egress from the driveway. Mr. Deeter and his daughter, Roselyn, walked to the rear of the house, where they saw the defendant standing outside. Mr. Deeter inquired of the defendant what he was doing there, and the defendant replied that he was there to ask for directions to another house. At this time, Roselyn noticed another woman running across the lot adjacent to the Deeter home, and set out in pursuit. Within a few minutes, this other woman, one Lillian Mahfood, returned to the Deeter residence by way of the road and walked up the driveway. By this time, the Deeters had

434

noticed that their home had been entered and, as Mrs. Deeter put it, "ransacked." Their kitchen was in disarray, and their television set had been pushed from its usual location to a point near the door. Several kitchen appliances, such as an electric blender and can opener, were lying on the driveway next to the Volkswagon. One of the screens had been removed from the house, and the window was open.

The police were called, and, in a search of the lot next to the house, they found a pillowcase containing various items which had been taken from the Deeters' bedrooms. The defendant stated to the police that he had been looking for the home of a former employer of Joanne Hogrewe, and had merely stopped at the Deeters in order to ask directions. He denied knowing that anyone had entered the Deeter home, and denied knowledge of how the various articles belonging to the Deeters had come to be outside the house.

Joanne Hogrewe, Lillian Mahfood and the appellant were jointly indicted for burglary. Lillian Mahfood entered a plea of guilty and testified for the State at the trial of appellant and Joanne Hogrewe.

At the trial, the testimony of the Deeters and the police officers was as indicated above. Lillian Mahfood was the principal witness for the prosecution. On direct examination, she testified that she, Novak and Joanne had gone to the Deeters for the purpose of learning the location of the home of Joanne's former employer. It appeared that Joanne wanted to inquire about returning to work. According to Lillian, however, the nature of the visit was rapidly altered when Novak determined that no one was home at the Deeters. She testified that, after knocking at the door and receiving no response, Novak began to remove the screen window. She told him that she did not think this was a good idea, because the owners of the house might return at any time. Novak ignored her warning, how-

ever, and entered the house through the window. Lillian testified that she, too, entered the house through the door when it was opened by Novak. She took some kitchen appliances and placed them in the cargo compartment of the Volkswagon. She returned to the house and moved the television set toward the door. At this time, she heard the sound of the Volkswagon horn. Realizing that something was amiss, she ran out the back door and across the field. She was eventually overtaken by Roselyn Deeter, and decided to return to the premises. She removed the kitchen appliances from the Volkswagon and placed them on the driveway.

On cross-examination, Lillian Mahfood admitted that there had been a fourth person in the party at the time of the burglary. This, she said, was a man named "Bobby," whom she had met that day for the first time. She testified that she had never previously told anyone about Bobby's presence at the scene. She denied that Bobby was the one who had removed the screen and opened the window, and insisted that it was Novak who had done this. She admitted, however, that Bobby had been in the house. She stated that she had had a fleeting glimpse of Bobby as he ran out the back door, and had never seen him again. Her explanation of her failure to mention Bobby to anyone was simply that she saw no point in involving anyone else.

On further cross-examination of Lillian, defense counsel developed that, at the time of the burglary, she was a narcotics addict and worked as a prostitute to obtain money for drugs. She denied, however, that "Bobby" was her source of drug supply and her pimp. Defense counsel sought to establish that Bobby initiated the burglary, and that Lillian was protecting him because he was essential to her as a source of narcotics. Lillian denied that she had any such connection with Bobby, and denied that it was Bobby who initiated the

burglary. She further denied that she had ever had any conversations with Novak wherein she had stated that Bobby was her pimp and drug supplier.

Joane Hogrewe took the stand in her own defense. She testified that they had gone to the Deeters for the purpose of asking directions to the home of her former employer. According to her, Novak knocked on the side door of the house, got no response, and then disappeared around to the rear of the house. Then, while Novak was out of sight, Bobby got out of the car and started taking the screen window off. She remonstrated with him about this, but he persisted. Lillian was with Bobby at the window, and they both told Joanne to mind her own business. Bobby eventually got the window open and crawled into the house. He then opened the door, and Lillian went in. Lillian began carrying things out of the house and putting them in the back of the Volkswagon. She then went back into the house, and it was at this point that the Deeters arrived. Joanne testified that she never saw Novak in the house, and denied that Novak had anything to do with opening the window or carrying any of the goods out of the house.

Appellant's testimony as to his own activities at the house agreed with the testimony of Joanne. He stated that he was behind the house when the Deeters arrived, and that he had at no time been inside the house or had anything to do with taking anything out of the house. He further testified that, on several occasions prior to the date of this occurrence, Lillian Mahfood had told him that Bobby was her source of supply for her narcotics and that he was her pimp.

The record does not indicate what verdict was returned as to Joanne Hogrewe.

 Appellant assigns two errors. The first of these is that the court refused to allow him to testify to certain conversations which took place among the

437

occupants of the Volkswagon on the day in question. Appellant does not specify which conversations he has in mind, but, in view of the fact that this is a pro se appeal, we have carefully examined the entire record. It is true that several objections were sustained to questions which sought to elicit from appellant the subject matter of certain conversations which occurred during the course of the day. The prosecuting attorney apparently objected on the theory that anything said by anyone was hearsay, and, for the most part, his objections were sustained. However, considerable testimony as to conversations was admitted without objection. No offer of proof was made on any of these questions to which an objection was sustained. Therefore, since we do not know what the testimony would have been, we have no way of knowing whether the testimony would have been proper. It may have been hearsay or not; it may have been material or not; its rejection may have been harmful to the defendant or not. This case provides a good illustration of why an offer of proof must be made if the exclusion of evidence is to be assigned as error. Without an offer of proof, the reviewing court is in no position to determine whether error has been committed. That is the position in which we find ourselves, and, accordingly, appellant's first point must be rejected.

 Appellant's remaining assignment of error has merit, and it requires that the case be reversed and remanded for a new trial. While he was on cross-examination by the State's Attorney, the following occurred:

"Q. On the 16th of September, Mr. Novak, did you use narcotics?

A. No, Sir."

The only reference to narcotics on appellant's direct examination was his testimony concerning the use of narcotics by Lillian Mahfood. Prior to this question on cross-examination, there was no evidence that appellant was connected in any way with the use of narcotics, and, of course, he was not on trial for a narcotics offense, but for the crime of burglary. However, had the matter ended here, we would be inclined to regard the question as harmless error, despite its obvious impropriety. With all of the testimony concerning the use of narcotics by Lillian Mahfood, the jury may have wondered whether appellant, being her associate, also used narcotics. Defendant's negative answer to the question may well have cleared the air in this regard. This may have been the reason for the absence of objection by defense counsel, and, of course, his failure to object is another reason why we would tend to regard this question and answer, standing alone, as error not requiring reversal.

But the matter did not end there. As a rebuttal witness, the prosecution recalled a police officer who testified as follows:

"Q. Calling your attention to the 16th of September, 1962, at about 5:30 p. m.: you previously testified that you were at the Deeter residence at that time?

A. Yes, Sir.

Q. Did you make a physical examination of the person of Ronald Novak at that time?

A. Of the what?

Q. Of the person of Ronald Novak.

A. Partially.

Q. What part did you examine?

A. Arms.

Q. What did you note at that time, if anything?

A. Needle marks.

MR. TURNER: Objection to the form of the question. It is in no way material to the issues on trial here today.

THE COURT: He may answer. You may answer, sir.

THE WITNESS: The answer, your Honor?

THE COURT: You may answer, or did you?

THE WITNESS: I did say needle marks.

BY MR. HENNINGER:

Q. Where were these needle marks located?

A. On the arm.

Q. Can you be more specific? What portion of the arm?

A. I don't recall which arm. In this portion of the arm in here. (Indicating.)

Q. Showing on the inside of the elbow area?

A. The inside, yes.

MR. HENNINGER: That is all."

On cross-examination, defense counsel did his best to dispel the effect of this testimony:

"Q. Officer, you of your own knowledge would have no idea what caused these particular marks?

A. What would cause them?

Q. No, as to what did cause them.

A. No. When I see needle marks, I don't pick a cause.

MR. TURNER: Fine. Thank you very much, Officer.

THE COURT: Thank you, sir."

■ ■ It was bad enough that this collateral matter was injected into the cross-examination of the defendant. This "rebuttal" testimony, apparently offered to "impeach" the defendant's denial that he used narcotics, aggravated the situation and must surely have created the impression in the minds of the jury that the defendant was a user of narcotics and that this was one of the things they were to consider in arriving at their verdict. The fact that defendant's objection was overruled would reinforce this impression.

In his final argument to the jury, the prosecutor again referred to the matter of the defendant's use of narcotics:

> "He is asked was he on narcotics at that time, and he said no, but the police officer testified he saw the needle marks on the arm.
>
> MR. TURNER: I will object to that reference. There is no reference at all that the needle marks were narcotics.
>
> The officer said he didn't know where the needle marks came from. I believe counsel is well familiar with the evidence and it should be stricken and the jury should be instructed to disregard such statements.
>
> MR. HENNINGER: I think this is proper argument. This is in the record.

441

THE COURT: You may proceed."

This was improper argument. First of all, the question of defendant's use of narcotics, if indeed he did use them, was not a proper issue in the trial. Secondly, this remark of counsel was not based on the evidence. While there was evidence of needle marks, there was no evidence that these marks were the result of narcotic injections. It would be arguable that this remark of counsel was reversible error even had the objection been sustained, and there can be no doubt that the prejudicial effect of the remark was heightened by the refusal of the court to sustain the objection.

The point that defendant argues in connection with this material about his use of narcotics is that it was error to introduce evidence that he was guilty of a crime other than the one for which he was on trial. Defendant does not specify what crime he believes is suggested by this evidence. The State attempts to dismiss this matter quickly, in exactly seven lines of its brief, by an airy reference to the fact that, in People v. Davis, 27 Ill2d 57, 188 NE2d 225 (1963) the statute making narcotics addiction a crime was held to be unconstitutional. Thus, we are asked to conclude that there was no evidence offered that defendant was guilty of another "crime."

The question is not whether narcotics addiction is a crime. The question is whether the suggestion in the evidence and in the argument of counsel that defendant was a user of narcotics was immaterial and inflammatory. The question must be answered in the affirmative. The State does not even attempt to suggest any basis on which the references to the defendant's alleged use of narcotics could have been material, and we cannot conceive of any either. It needs no extended discussion to demonstrate that the use of narcotics is regarded by the major part of society with aversion

and contempt, and that the references to the matter undoubtedly prejudiced the defendant in the eyes of the jury.

As to whether these references amounted to a suggestion that defendant was guilty of another "crime," we do not think even this technical phase of the matter can be brushed off as easily as the State would like. While addiction itself is not a crime, the addict is usually guilty of at least two other crimes, purchase and possession, in connection with his use of narcotics. Therefore, we think that this evidence did tend to suggest that defendant was guilty of another crime. However, as we have already pointed out, the impropriety of the evidence does not lie primarily in the fact that it suggests another crime—it lies, rather, in the fact that it injects immaterial and inflammatory matter into the trial, whether or not that matter amounts to evidence of the commission of another crime.

We think this case is in some respects similar to People v. Battle, 24 Ill2d 592, 182 NE2d 713 (1962), where the State introduced evidence of the narcotics activities of the defendant in an effort to show a motive for the murder with which he was charged. The theory of the State was that defendant killed the deceased because the deceased had informed the police about defendant's narcotics activities. The court pointed out that there was no evidence that defendant knew the deceased had given any information to the police, and reversed the murder conviction because of the admission of this improper evidence concerning narcotics activities. In the instant case, the State makes no argument whatever, specious or otherwise, that the references to the defendant's use of narcotics had anything to do with the burglary charge.

We cannot say that the evidence of defendant's guilt was so clear that this improper evidence had no effect

upon the result. We think the case is close enough that the improper references to defendant's use of narcotics may well have affected the verdict, and, accordingly, the case must be reversed and remanded for a new trial.

Reversed and remanded.

ABRAHAMSON, P. J. and DAVIS, J., concur.