THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DUSAN DZAMBAZOVIC, Defendant-Appellant.

First District (2nd Division)   No. 76-1412

Opinion filed May 31, 1978.

Charles A. Bellows, of Chicago (Ronald N. Heftman and Bellows & Bellows, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Iris Sholder, and Wendy Paul Billington, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE BROWN delivered the opinion of the court:

The defendant, Dusan Dzambazovic, was indicted on two counts of murder. After a jury trial in the circuit court of Cook County, he was found guilty of the offense of murder and sentenced to a term of 14 years to 14 years and one day. The defendant appeals from his conviction, raising the following issues for our review: (1) whether the defendant made a knowing and intelligent waiver of his right to the presence of an attorney before making oral confessions and whether the trial court erred in denying the defendant's motion to suppress statements and in admitting his out-of-court confessions into evidence; (2) whether the trial court erred in denying the defendant's motion for a continuance; (3) whether the trial court erred in refusing to permit defense counsel to conduct the *voir dire* examination of the jury; (4) whether the trial court erred in admitting into evidence testimony that the defendant had made threats against a third party; (5) whether the trial court erred in permitting the prosecution to cross-examine the defendant as to his use of narcotics and to introduce testimony in rebuttal that the defendant had admitted that he had been a narcotics addict; and (6) whether the trial court erred in refusing certain jury instructions tendered by the defendant.

The undisputed facts are that the victim, Rosemary Weiss, attended Southern Illinois University in Carbondale, Illinois, in 1971, at which time she met the defendant. By 1972 they were living together until she graduated in 1973. He testified they intended to marry. In the summer of 1974, the defendant came to Chicago and lived with Rosemary in her apartment. In the fall of 1974, he went back to school in Carbondale, and came to Chicago on weekends and stayed at the apartment with Rosemary. During the weekend of October 11, 1974, the defendant learned that Rosemary had been dating another person. Rosemary called him in Carbondale on Monday, October 14, 1974, and told him she wanted to talk things over in person. He returned to Chicago that same day. In the evening of Friday, October 18, 1974, she told him she had decided not to see the man she had been dating anymore. She called the man that night. Defendant also called the man.

The defendant met Rosemary at her place of employment in Chicago about noon on October 19, 1974. He drove her car, and there was a discussion about her new boyfriend, Tom Sanhamel. As they drove into Evanston, an argument ensued. A gun was produced and Rosemary Weiss was shot and killed. She fell on the pavement. Her car was driven off by the defendant.

We shall proceed to consider the issues in the order previously stated.

*First.* Whether the defendant made a knowing and intelligent waiver of his right to the presence of an attorney before making oral confessions and whether the trial court erred in denying the defendant's motion to

suppress statements and in admitting his out-of-court confessions into evidence.

Prior to trial, the defendant filed a motion to suppress statements which alleged that he was denied the opportunity to consult with an attorney.

At the hearing on the motion to suppress, the defendant testified that on October 19, 1974, he met a Chicago police officer at the intersection of Devon and California in Chicago, and that he was not informed of his constitutional rights at that point. He stated that he was then taken to the intersection of Ridge and Devon in Chicago, where he met Lieutenant Schram of the Evanston Police Department, and had a conversation with Schram in a Chicago Police Department squad car. He stated that he and Schram were alone, and Schram informed him of his constitutional rights: that he had the right to remain silent, that everything he said might be used against him, that he had a right to a lawyer. The defendant testified that he told Schram that he would like to get in touch with his parents so he could get in touch with a lawyer, to which Schram responded that he would have that opportunity when he got to the station. He testified that Schram continued to have a conversation with him for about a half an hour, and then he got into an Evanston police vehicle. He testified that another policeman drove, Schram continued to question him, and he asked a couple of times to call his parents to obtain a lawyer. He stated that after riding around the northern part of Evanston, he arrived at the Evanston police station and was questioned by Schram, who was alone; that he requested permission to call his parents to get a lawyer three or four times, and was allowed to call, but his parents were not home, and the questioning then continued. A short time later, he reached his parents and they provided him with a lawyer, Rakowski, who told him not to say or sign anything and not to make any statements. He stated that Schram told him that his lawyer called and told Schram not to ask any more questions and that he should not sign any papers.

On cross-examination, the defendant testified that he approached the Chicago police officer and did not tell him that he had just shot Rosemary Weiss. He testified that before he talked to Schram in the Chicago police vehicle, Schram advised him that he didn't have to tell him anything, that he had the right to a lawyer, and that if he was too poor and couldn't afford one, one would be appointed for him. He stated that Schram did not force him to say anything, but he wanted to talk to a lawyer first; that he sat in the car for about 10 minutes and told Schram he wanted a lawyer, and Schram kept asking him questions. He stated that he and the officers drove around in the Evanston police vehicle for about a half hour and he showed them where a car was parked that belonged to his girl friend, Rosemary Weiss.

Lieutenant Schram testified that he entered the rear of the Chicago

Police Department squad car, identified himself to the defendant, and told him that he liked to talk about the murder of Rosemary Weiss, to which the defendant replied "okay." Schram then advised him that he was required to inform him of his constitutional rights before he questioned him, and the defendant said that he understood. Schram testified that he informed defendant that he had the right to remain silent, and that if he chose not to remain silent, anything he said or wrote could and would be used against him as evidence in court; that he had a right to consult with a lawyer before any questioning and he had the right to have the lawyer present with him during any questioning; that if he did not have the financial ability to retain a lawyer, one would be appointed to represent him before and during any questioning. According to Schram, after each right was stated, he asked the defendant whether he understood that right, and the defendant responded affirmatively each time. Schram testified that he then asked the defendant whether he was still willing to make a statement and answer questions, knowing his constitutional rights without talking to a lawyer and without having a lawyer present, and the defendant replied affirmatively. He stated that the defendant did not request to speak with his parents or with an attorney at that time; that two or three minutes later, he placed defendant in an Evanston squad car, driven by another Evanston police officer. They drove around Chicago and Evanston for about 30 to 45 minutes, and the defendant pointed out Rosemary Weiss' car. They did not find the pistol the defendant told them to look for. Upon their arrival at the Evanston Police Department, Schram asked the defendant to execute a written statement regarding his previous conversation in the car. The defendant replied "[M]aybe I had better talk to a lawyer first." Schram stated that he then advised him that this is one of his constitutional rights and asked him if he knew a lawyer to call. The defendant said "No," but that he would like to call his mother. Schram testified that at that time, the defendant was permitted to call his mother, and the questioning stopped.

On cross-examination, Schram testified that after he advised the defendant of his constitutional rights and the defendant gave answers, he went right on asking him questions. He stated that both he and Detective Page made police reports.

After arguments of counsel, the defendant's motion to suppress was denied.

At trial, Officer Erwin of the Chicago Police Department testified that on October 19, 1974, the defendant walked up to his marked squad car and told him that he had just shot his girl friend, Rosemary Weiss. He stated that he placed the defendant under arrest, advised him of his rights, and placed him in the rear of the squad car.

Lieutenant Schram's trial testimony covered much of the same ground

as previously set forth in the hearing on the motion to suppress. After Schram related that the defendant stated that he was willing to make a statement, Schram stated that the defendant then told him that he had shot his girl friend after an argument about a person named Tom, who had been dating Rosemary. Schram testified that the defendant had told him, while riding to the Evanston Police Department with Detective Page driving, that an argument ensued and Rosemary told him that she didn't want to talk to him anymore and she tried to get out of the car while the car was moving; that he had stopped the car and grabbed Rosemary, but she was able to pull away from his grasp and stepped outside of the car; and that while she was just immediately outside of the car on the passenger side, he pulled a pistol from his waistband and fired one shot at her. Schram said the defendant told him that Rosemary fell to the ground and he drove off, and that he threw the gun out of the window when he was approximately 10 blocks from the scene. He then drove to California and Pratt Avenues and boarded a bus, getting off at Devon, where he flagged down a Chicago police squad car. Schram stated that the defendant stated to him that he told the Chicago police officer that he had just shot someone and he wanted to surrender, and that the Chicago police officer did not ask any questions before he made this statement. Schram testified that the defendant, while at the Evanston police station, gave him the same story that he had given while in the vehicle proceeding to the station. He further testified that the defendant was handcuffed in the Chicago and Evanston squad cars and at the Evanston police station.

The testimony of Detective Page corroborated Lieutenant Schram regarding the statements of the defendant made on the way to the Evanston Police Department. Detective Page also testified that the defendant was handcuffed during the ride in the Evanston squad car.

■■ The warnings given the defendant complied with the constitutional requirements set out in *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. (See *People v. Gilbert* (1st Dist. 1978), 58 Ill. App. 3d 387, 374 N.E.2d 739.) The question whether the defendant voluntarily and knowingly waived the *Miranda* rights is a question for the trial court's determination, not to be disturbed unless against the manifest weight of the evidence. (*People v. Wipfler* (1977), 68 Ill. 2d 158, 171, 368 N.E.2d 870.) The question was a factual one, the answer to which depended upon the acceptance or rejection of the defendant's testimony or that of the police officer given at the hearing on the motion to suppress. (*People v. Moon* (1st Dist. 1976), 38 Ill. App. 3d 854, 861, 350 N.E.2d 179; *People v. Noonan* (1st Dist. 1972), 5 Ill. App. 3d 1109, 1111, 284 N.E.2d 446.) "It is for the trial court to resolve conflicts in the evidence presented. The trial judge, having observed the demeanor of witnesses, having heard their testimony and having evaluated other evidence, is the one best equipped

to determine the voluntariness of a confession." (*People v. Medina* (1978), 71 Ill. 2d 254, 258, 375 N.E.2d 78, 79.) In the instant case, the trial court's determination was not against the manifest weight of the evidence. There was no infringement upon defendant's constitutional rights and the trial court did not err in denying defendant's motion to suppress and in admitting his out-of-court confessions into evidence.

*Second.* Whether the trial court erred in denying the defendant's motion for a continuance.

The defendant filed a discovery motion on May 5, 1975. Before trial, the State tendered to the defense police reports and the transcripts of the grand jury and preliminary hearing proceedings.

On Monday, June 14, 1976, the date set for trial, the State tendered to the defense its formal answer to discovery. Defense counsel moved for a continuance upon two grounds: (1) that his expert toxicologist would be on vacation until July 4, 1976; and (2) he needed time to examine laboratory reports tendered to him that morning and new witnesses listed in the State's answer to discovery.

Defense counsel stated that he expected his toxicologist to testify that the blood of the deceased had contained morphine, that morphine is a derivative of heroin, and that heroin would affect the rational conduct of the deceased. He stated that this would be important for his defense, to show the shooting came about in the struggle for a gun and was accidental. The State responded that the doctor would not be allowed to testify that it could have been heroin and that a person under the influence of heroin might act irrational.

Defense counsel had initially requested a continuance until "right after" July 4. After considerable discussion, defense counsel requested a continuance until Thursday, June 17, 1976, in order to find another toxicologist and to examine and check the accuracy of the laboratory reports. His request was denied.

After reconvening that afternoon, the State argued that all witnesses listed in its answer to discovery were listed in the police reports tendered to defense counsel in May 1975. The State indicated that two of the three laboratory reports were received by it that week. Defense counsel stated that the laboratory reports were respectively dated February 3, 1976, June 11, 1976, and June 30, 1976 (*sic*), and one report referred to "microscopic examination of clothing, relates to the pellet and in the opinion of the examiner as to what kind of gun it was." The trial court began the *voir dire* examination of the jury and continued the cause until 10:30 a.m. on Tuesday, June 15, 1976.

The record indicates that the *voir dire* examination of the jury was completed on Tuesday, June 15, 1976, and the cause was adjourned until 9 a.m. on Wednesday, June 16, 1976. However, there is no transcript of

proceedings of Wednesday, June 16, 1976, contained in the record. On Thursday, June 17, 1976, defense counsel stated that he continued the effort to prepare for trial "during yesterday," but that he could not meet the problems that were engendered by the State's answer to discovery. The defendant's motion for a mistrial was denied, and the State called its first witness. In *People v. Lott* (1977), 66 Ill. 2d 290, 296-97, 362 N.E.2d 312, our supreme court stated:

> "By statute in Illinois, the granting or refusing to grant a motion for continuance lies in the sound discretion of the court (Ill. Rev. Stat. 1973, ch. 38, par. 114—4(e)), and, even absent specific grounds stated in sundry subsections, the court may grant a continuance in the 'interests of justice' (Ill. Rev. Stat. 1973, ch. 38, pars. 114—4(d) and (f)). The statute further sets forth one criterion to be entertained in the decision to grant a continuance, the 'diligence shown on the part of the movant' (Ill. Rev. Stat. 1973, ch. 38, par. 114—4(e)). Section 114—4(h) provides the framework of statutory interpretation for the decision: the continuance provisions are to be construed 'to the end that criminal cases are tried with due diligence consonant with the rights of the defendant and the State to a speedy, fair and impartial trial.'
>
> * * *
>
> There is no mechanical test, statutory or other, for determining the point at which the denial of a continuance in order to accelerate the judicial proceedings violates the substantive right of the accused to properly defend. The circumstances of each case must be weighed, particularly the reasons presented to the trial judge at the time the request is denied."

The trial court's refusal to grant a motion for a continuance will not be disturbed unless the defendant has been prejudiced by the denial. *People v. Canaday* (1971), 49 Ill. 2d 416, 427, 275 N.E.2d 356.

As to the expert toxicologist, the record reveals that defense counsel became aware of his unavailability on Thursday, June 10, 1976, four days prior to the date the case was set for trial. We believe this was ample time for the defendant to obtain another toxicologist in the absence of a showing in the record of insufficient time to do so. The defendant did not show "due diligence," as he failed to inform the trial court of any attempt made to obtain another toxicologist during this four-day period prior to trial.

■■ As to "new" witnesses listed in the State's answer to discovery, defense counsel failed to identify those witnesses at the time of arguments on the motion for a continuance. We are cognizant of the principle that on a charge of murder, as here, as well as certain other crimes, every reasonable opportunity should be afforded a defendant to investigate the

witnesses against him to prepare his defense. (*People v. Crump* (1955), 5 Ill. 2d 251, 263, 125 N.E.2d 615; *People v. Brown* (1st Dist. 1973), 13 Ill. App. 3d 277, 280, 300 N.E.2d 831.) Under the facts and circumstances of this case, we believe a reasonable opportunity was afforded the defendant in that the trial court told defense counsel that he could examine the witnesses before they testified at trial so that "* * * no one would be taken by surprise."

In arguing the defendant's motion for a new trial, defense counsel identified 16 persons listed in the State's answer to discovery of which he had "no knowledge" on the morning of trial. Of the 16 persons, six were witnesses for the State and one was a witness for the defendant. The record shows effective cross-examination of five of these six State witnesses; defense counsel chose not to cross-examine Officer Warner of the Chicago Police Department Crime Lab.

■■■ The three laboratory reports are not part of the record. "When the appellant is responsible for the incompleteness of the record in an appellate court, the reviewing court will indulge in every reasonable presumption favorable to the conclusion reached by the trial court. Any doubt arising from the incompleteness of the record will be resolved against the appellant." (*People v. Spellman* (1st Dist. 1978), 58 Ill. App. 3d 648, 374 N.E.2d 1034.) However, the record supports the conclusion that the three laboratory reports were prepared by Officer Warner, a firearms examiner, Denise Nielson, a criminalist, and David Brundage, a firearms examiner. At the time each witness testified, defense counsel sought a stipulation as to the contents of their respective reports. In light of these stipulations, which were refused by the State, we cannot say that the defendant had an insufficient amount of time to examine the three laboratory reports.

Under the facts and circumstances of the instant case, we find that the trial court did not abuse its discretion in denying the defendant's motion for a continuance and the defendant was not prejudiced by that denial.

*Third.* Whether the trial court erred in refusing to permit defense counsel to conduct the *voir dire* examination of the jury.

The defendant contends that his counsel was denied the opportunity to conduct his own *voir dire* examination of the jury. (Ill. Rev. Stat. 1975, ch. 38, par. 115—4(f).) *Voir dire* was conducted by the trial judge in accordance with Supreme Court Rule 234 (Ill. Rev. Stat. 1975, ch. 110A, par. 234), made applicable to criminal trials by Supreme Court Rule 431 (Ill. Rev. Stat. 1975, ch. 110A, par. 431).

Defendant's contention is without merit, since section 115—4(f) (Ill. Rev. Stat. 1975, ch. 38, par. 115—4(f)) has been held to be void as a legislative infringement upon the powers of the judiciary. (*People v. Jackson* (1977), 69 Ill. 2d 252, 371 N.E.2d 602.) Supreme Court Rule 234

(Ill. Rev. Stat. 1975, ch. 110A, par. 234) regulates the method of *voir dire* examination of prospective jurors. *Jackson.*

*Fourth.* Whether the trial court erred in admitting into evidence testimony that the defendant had made threats against a third party.

Prior to the testimony of Thomas Sanhamel, who had dated the victim, the State made an offer of proof that he would testify that the day before Rosemary's death, he had received a call from the defendant and the defendant said "* * * if Rosemary is there with you, not only will he get hurt but he will also hurt Rosemary." The State argued that his testimony would be admissible to show state of mind, motive and intent. After arguments of counsel, the trial court ruled that Sanhamel could testify. Defense counsel objected to this ruling.

Sanhamel testified that at about 7 p.m. on about October 12, 1974, he received a telephone call at his home. He stated that he had never before heard that voice. Over defense objection, he testified that the voice on the other end of the phone stated that he was "Dusan, Rosemary's boyfriend." Sanhamel further testified that at about 7:30 p.m. on October 18, 1974, he received a phone call at his home. Over defense objection, he testified that the person on the phone said, "This is Rosemary's boyfriend," and that it was the same voice he had heard the previous week. Over the defense's standing objection, Sanhamel was asked, "And whose voice did you recognize it to be?" Sanhamel answered, "As Rosemary's boyfriend, Dusan." He testified that the person told him "that he didn't want me seeing her any more, he was tired of it, and if I persisted he was going to kill me, and he would also make it hard on her."

■■ Defense counsel had objected on grounds of improper identification of the voice. "The rule is that telephone conversations, the substance of which is relevant and material to the issues, are competent provided the identity of the person with whom the conversation was had is established by direct evidence or facts and circumstances. [Citation.]" (*People v. Nichols* (1942), 378 Ill. 487, 490, 38 N.E.2d 766; *People v. Reddock* (2d Dist. 1973), 13 Ill. App. 3d 296, 309, 300 N.E.2d 31, *appeal denied* (1973), 54 Ill. 2d 598.) In the instant case, the defendant testified he called the man Rosemary had been dating. A review of the record places the time of this call on Friday night, June 18, 1974. Nancy Habel, Rosemary's roommate, testified that Rosemary might have been going out with a person named "Tom." Lieutenant Schram testified that he had asked the defendant if he had called Tom the night before and threatened him, and the defendant replied that he had and that Rosemary gave him Tom's phone number. Detective Page testified that Lieutenant Schram asked the defendant if he had threatened Tom by telephone the night before and the defendant said that he had. The identity of the defendant as the person with whom

the conversation was had was established by this direct evidence. *Nichols.*

■■ The defendant contends that the trial court erred in not sustaining defendant's objection with respect to that part of Sanhamel's testimony recounting the threat against him. Immediately after Sanhamel testified to the threat, defense counsel stated "all right, now I want to be heard, your Honor," to which the trial court replied "You may." A side bar conference was held and the State then continued with its examination of Sanhamel. Although defense counsel's statement may perhaps be considered to be a general objection, he failed to request a ruling after the side bar conference. The failure of a trial court to rule on objections to evidence is not open to review at the instance of one who failed to request a ruling when the court did not make one. (*People v. Weiss* (1937), 367 Ill. 580, 12 N.E.2d 652; *People v. Todorovic* (1st Dist. 1977), 53 Ill. App. 3d 1, 368 N.E.2d 471.) Therefore, the defendant has waived consideration of this issue.

Nonetheless, we shall proceed to consider his contention.

> "It is a rule well settled in this State that a threat by the accused to kill or injure a person other than the deceased, or a mere charge of a general nature not directed to any particular person, is not admissible to show malice toward the deceased." (*People v. Sorrells* (1920), 293 Ill. 591, 596, 127 N.E. 651; see *People v. Scott* (1918), 284 Ill. 465, 474, 120 N.E. 553.)

The threats must in some way be linked to the victim. *People v. Watkins* (1st Dist. 1975), 34 Ill. App. 3d 369, 374, 340 N.E.2d 92.

> "The general rule is that threats to commit the crime for which the accused is on trial are competent as evidence against him upon the question whether he in fact committed it, as showing intention. An expression, to be admissible as a threat, must be of such character or made under such circumstances as to indicate a hostile purpose on the part of the speaker. The language used, or the circumstances under which used, must be broad enough to include the injured person within its terms, but threats, even against third persons, may be admissible where the connection between them and the deceased is such that under certain circumstances the threats would import harm to or hostility toward the deceased.* * *" *People v. Scott* (1918), 284 Ill. 465, 474.

■■ We believe that the following portion of the testimony objected to "* * * if I persisted he was going to kill me,* * *" is admissible standing alone, since the connection between a threat to kill Sanhamel and the deceased is such that this threat would import harm to or hostility towards the deceased because they had been dating and their dating is what

prompted defendant's telephone call. *Scott.* The remainder of the statement, "* * * and he would make it hard on her," shows that the entire threat encompassed the deceased and the third person, Sanhamel, because of her relationship with Sanhamel.

We find that the trial court did not err in admitting into evidence Sanhamel's testimony concerning defendant's threat.

*Fifth.* Whether the trial court erred in permitting the prosecution to cross-examine the defendant as to his use of narcotics and to introduce testimony in rebuttal that defendant had admitted that he had been a narcotics addict.

State's witness Nancy Habel, Rosemary's roommate, testified on cross-examination that Rosemary had smoked marijuana. She testified on redirect examination, over defense objection, that she had once seen Rosemary smoke marijuana with the defendant.

State's witness Officer Gresham, an investigating police officer, testified on cross-examination that his search of Rosemary's room yielded empty boxes that once held syringes. He stated that he observed "track marks" on one of her upper arms and on her back when he viewed her body at the hospital. He defined "track marks" as "* * * a term used primarily when dealing with a person who uses a needle of some sort to inject a substance of a controlled substance or narcotic into his veins."

State's witness Officer Higginson, an evidence technician, testified on direct examination that he stripped, photographed, and fingerprinted the body of Rosemary Weiss and inventoried her clothing at St. Francis Hospital. He stated on cross-examination that he observed "track marks" on one of her arms and on her back. He defined "track marks" as "* * * marks left on a body by a needle used to inject something into the body."

During direct examination of Detective Page, the State asked what he noticed about the physical condition of the defendant. The defense objected, and at a side bar conference the State indicated it intended Page to testify that he had observed track marks on the defendant's arms. The trial court sustained the objection.

State's witness Dr. Tae An, a pathologist who conducted an autopsy upon the deceased, testified on cross-examination that the toxicologist's report showed the presence of 1.5 milligrams of morphine in the urine of the deceased and that heroin can be metabolized as morphine in the urine. Dr. An testified on direct examination that morphine found in the urine can also be just morphine.

Thereafter, on cross-examination of the defendant, the following exchange occurred:

"PROSECUTOR: Did you ever use drugs?

DZAMBAZOVIC: No.

DEFENSE COUNSEL: Objection, if the court pleases.

THE COURT: The answer is, no. It may stand.

DEFENSE COUNSEL: I objected to the improper cross-examination.

THE COURT: Overruled. It may stand.

PROSECUTOR: Did Rosemary ever use drugs in your presence?

DZAMBAZOVIC: Well, she smoked marijuana. She grew a pot in the apartment with her roommate.

PROSECUTOR: Did you ever have occasion at any time prior to today to tell anybody about any occasion where you or Rosemary used drugs?

DEFENSE COUNSEL: I object * * *

THE COURT: Overruled.

DZAMBAZOVIC: Did I tell anybody * * * I don't remember, I don't know."

Detective Page was called in rebuttal by the State. He stated that he had observed the defendant in the Evanston police station on October 19, 1974. Page was then asked, "Please tell us what you observed about the defendant at that time?" The defense objected on the ground that the question was improper rebuttal. At a side bar conference on the objection, the prosecution stated that it intended to introduce testimony rebutting the defendant's testimony on cross-examination that he never used drugs and that he never told anybody that he used drugs. The defense's objection and motion for a mistrial were denied. Page then testified that while he was searching the defendant after his arrest, he observed track marks on his right arm. A defense objection was again overruled.

Page said he had asked the defendant if he was an addict, and that the defendant replied that he used to be an addict, but was not presently. Page stated that the defendant had told him that he had "shot up with coke" with Rosemary "a couple days ago."

Page stated on cross-examination that the defendant's statement that he had been an addict, but was no longer an addict, did not appear in his police report. Page also stated that he never told the prosecutors of the conversation in which the defendant told him that he had once been an addict prior to the morning that he was called as a rebuttal witness.

Page testified on redirect examination, over defense objection, that his report stated that he observed track marks on the defendant's arm and that the defendant said he shot up with coke.

In surrebuttal, the defendant denied having told Detective Page that he was an addict and denied that he and Rosemary were "coked up." The defendant exhibited his right arm to the jury.

On cross-examination, the State elicited from the defendant that

approximately 21 months had passed since October 1974, and that his whole body was in the same condition as it was in October 1974.

■■ Evidence of a defendant's use of or addiction to narcotics is inadmissible in a prosecution for an offense that does not involve narcotics. (*People v. Smith* (1967), 38 Ill. 2d 237, 243, 231 N.E.2d 185; see also *People v. Stadtman* (1974), 59 Ill. 2d 229, 319 N.E.2d 813; *People v. Battle* (1962), 24 Ill. 2d 592, 182 N.E.2d 713; *People v. Novak* (2d Dist. 1965), 63 Ill. App. 2d 433, 211 N.E.2d 554.) The trial court erred in not sustaining the defendant's objections to the State's inquiries as to the defendant's drug use during the redirect examination of Nancy Habel and the cross-examination of the defendant. So, too, the trial court erred in not sustaining the defendant's objections to the direct and redirect rebuttal testimony of Detective Page. We note that the trial court had sustained a defense objection during the State's case-in-chief to the testimony of Detective Page, which testimony was eventually admitted in rebuttal. Defense counsel could properly cross-examine Detective Page to dispel the effect of Detective Page's improper rebuttal testimony (*Novak*, at 440-41) and call the defendant in surrebuttal to deny it (*People v. Kirkwood* (1959), 17 Ill. 2d 23, 30, 160 N.E.2d 766).

■■ "Where error is shown to exist, it will compel reversal, unless the record affirmatively shows that the error was not prejudicial." (*Stadtman*, at 232.) In the case at bar, we believe that the record demonstrates that the defendant was not prejudiced by the fact that the jury heard the testimony concerning the defendant's use of narcotics. The defendant's oral confessions, as related by the police officers at trial, were persuasive evidence of guilt. In addition to Thomas Sanhamel's testimony concerning defendant's threat, Nancy Habel testified that the defendant had told Rosemary, while in the presence of the witness and approximately one week prior to her death, that he would kill her if she were to go out with any other men. In view of the overwhelming evidence of the defendant's guilt, we hold that the error was harmless beyond a reasonable doubt. *People v. Butler* (1974), 58 Ill. 2d 45, 317 N.E.2d 35; see also *People v. Bolden* (1st Dist. 1978), 59 Ill. App. 3d 441, 375 N.E.2d 898; *cf. People v. Novak* (2d Dist. 1965), 63 Ill. App. 2d 433, 211 N.E.2d 544.

*Sixth.* Whether the trial court erred in refusing certain jury instructions tendered by the defendant.

The trial court's refusal of the following instructions is asserted as error:

"I.P.I. 24.06—Defendant's Instruction No. 14. A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.

However, a person is justified in the use of force which is intended

or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself."

"Defendant's Instruction No. 13.

The Court instructs the jury that if they find from the evidence that the deceased was in possession of a gun and that the defendant was afraid the deceased would kill him or cause him great bodily harm, and therefore, he attempted to take the gun away from the deceased and in doing so the gun was fired which resulted in the death of the deceased, that under such circumstances you would find the defendant not guilty."

■■ By its very nature, self-defense relates to knowingly and intentionally using force to deter another and not to an accidental shooting. (*People v. Joyner* (1972), 50 Ill. 2d 302, 309, 278 N.E.2d 756.) If the defendant acted in self-defense he must necessarily have fired intentionally, whereas if the pistol was accidentally discharged all questions of self-defense are out of the case. (*People v. Jersky* (1941), 377 Ill. 261, 268, 36 N.E.2d 347.) In *People v. Tanthorey* (1949), 404 Ill. 520, 530, 89 N.E.2d 403, our supreme court held that the trial court properly refused the defendant's self-defense instruction where the defendant had testified that the killing was an accident; that he was not aware that he had fired the revolver or shot the victim; and that it was not his intention or purpose to shoot him. In the instant case, the evidence presented by the defendant did not raise the issue of self-defense. The defendant testified that he did not shoot at Rosemary with the intention of killing her; that when Rosemary became hysterical during their argument over Sanhamel, she pulled out a gun from the glove compartment of her car, and said that she would shoot the defendant and herself if the defendant drove to Sanhamel; that he grabbed for the gun and a struggle ensued; that while Rosemary was still holding the gun, a shot was fired. The trial court did not err in refusing the defendant's tendered self-defense instruction.

In this case, IPI Criminal Instructions Nos. 7.01 and 7.02, relating to the charge of murder, were given to the jury. The court instructed the jury that to sustain the charge of murder the State had the burden of proving beyond a reasonable doubt that the defendant performed the acts which caused the death of Rosemary Weiss and that when he did so he intended to kill or do great bodily harm to Rosemary Weiss, or he knew that his act would cause death or great bodily harm to Rosemary Weiss, or he knew that his acts created a strong probability of death or great bodily harm to Rosemary Weiss. "This instruction informed the jury that if they found that [Rosemary Weiss'] death was unintended, then the State had not sustained its charge of murder. An additional instruction to that effect would have been unnecessary." (*People v. Lyons* (1st Dist. 1976), 44 Ill.

App. 3d 802, 806, 358 N.E.2d 1183, *appeal denied* (1977), 65 Ill. 2d 583.) The trial court did not err in refusing the defendant's tendered accidental death instruction. "While it is true that a defendant is entitled to have a jury consider any legally recognized defense which is supported in the record [citation], it does not follow that the trial court must give an instruction which is superfluous." *Lyons,* at 806.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

DOWNING and PERLIN, JJ., concur.