THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY ROBINSON, Defendant-Appellant.

First District (2nd Division)   No. 85—1196

Modified opinion filed November 3, 1987, on denial of rehearing.

Steven Clark, Joan S. Colen, and Debra R. Salinger, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE STAMOS delivered the opinion of the court:

Defendant was convicted of murder after a jury trial and was sentenced to a term of 40 years' imprisonment. On appeal, he contends that: (1) he was denied his right to a fair trial where he was prevented from presenting evidence of and instructing the jury on self-defense; (2) the trial court erred in refusing to instruct the jury on involuntary and voluntary manslaughter; (3) he was denied his right to confrontation where the trial court restricted cross-examination of the State's witnesses; and (4) the trial court abused its discretion in sentencing defendant to 40 years' imprisonment without giving adequate consideration to his potential for rehabilitation.

The record reveals that the victim, Homer Davis, suffered a shotgun wound to the back on October 1, 1983, and died several days later. Defendant, who had been arrested on the night of the shooting, was charged with the murder and was tried in March 1985.

Marvella Sandifer, a neighbor of the deceased, testified that at approximately 8:30 p.m. on the evening of October 1, 1983, her attention was drawn to the street in front of her home by loud voices. She testified further as follows: Peering from the front door, she and her husband saw three men, identified as the victim, defendant, and Ronnie Mapps. Mapps carried a shotgun. The victim told defendant and Mapps that if they put down the gun, he would fight them. Defendant dropped a jacket he was carrying, snatched the gun from Mapps' hands, and told him, "I'll take the gun and break it down." The victim retrieved the jacket that defendant had dropped and began to back away. When the victim was approximately nine feet from defendant and Mapps, defendant held the gun to his waist and discharged it, striking the victim in the back. Sandifer ran to her kitchen and telephoned the police.

On cross-examination, Sandifer stated that she did not speak to the police about the incident that evening but spoke to the State's Attorney's office five days later at the request of the victim's brother. She was not permitted to testify to the substance of this conversation. Sandifer stated that she did not know Mapps by name until she spoke with an assistant State's Attorney.

Charles Woods, the victim's brother, testified that he was at home on October 1 when he overheard the victim engaged in an argument outside. Woods testified further as follows: He peered from the front window and saw the victim standing by defendant and Mapps. Mapps carried a shotgun. Woods immediately telephoned police, then went outside. Defendant snatched the shotgun from Mapps, dropped a jacket to the ground, and shot the victim as he retrieved the jacket and began to walk away. Woods screamed, and defendant and Mapps fled the scene. Woods identified defendant and Mapps for the police by name and in a police lineup later that evening.

On cross-examination, Woods stated that the victim had been involved in a fight with members of a street gang, to which defendant and Mapps belonged, approximately two weeks earlier. Woods denied that the victim belonged to a gang. He stated that he did not speak to Sandifer on the night of the shooting about the incident but did speak with her on a later date at the hospital, but he was not permitted to state how he learned she was an eyewitness, why she was at the hospital, or what was said in the conversation; the court characterized

this part of the cross-examination as "fishing."

Steven Shoup, a Chicago police patrol officer, testified that he responded to a radio call regarding a man shot at the scene of the incident. Shoup testified further as follows: Upon arrival, he observed a man, identified as the victim, lying on the ground in a pool of blood. Shoup approached the victim, who was conscious, and asked him what had happened. The victim replied, "Tony shot me," and further stated that his assailant was the defendant. When an ambulance arrived, Shoup searched the scene and found a used shotgun shell on the street by the curb. The officer then located witnesses to the shooting, Charles Woods and Diana Anderson, and entered their names in his case report.

Police sergeant James Gorman testified that he (at the time a detective) and his partner, Detective James Pienta, were assigned to investigate the victim's death. Gorman further testified as follows: After speaking to the victim at the hospital, the police returned to the scene and attempted to locate defendant and Mapps. Defendant and Mapps were found later that evening and transported to the police station, where they were questioned and placed in a lineup. Woods identified defendant and Mapps.

On cross-examination, Gorman stated that defendant's father visited his son as he was being questioned by police at the station. Gorman denied hearing defendant tell his father that two other men had shot the victim and further denied that anyone told defendant to "shut up."

Defendant's father, Eddie Robinson, Sr., testified that he arrived at the police station at approximately 11 p.m. on the evening of October 1 after learning that defendant had been arrested. The father testified further as follows: He was not permitted to see defendant until approximately 1:30 a.m. He asked defendant whether he had committed the shooting, but defendant was told by a police officer to "shut up" when defendant began to answer his father. The father was then instructed to leave.

Defendant testified that on the evening of September 17, 1983, approximately two weeks prior to the instant incident, he was standing in front of a liquor store with approximately 20 persons, including the victim and several friends. Defendant further testified as follows: He asked the victim to purchase a pint of whiskey for him. The victim purchased the liquor but then returned and passed it among his own friends. When someone passed the bottle to defendant's friend, the victim pulled out a gun. Defendant grabbed the victim's hand, and the gun discharged. Defendant and his friends fled.

On the evening of October 1, he left his home with Mapps to "make peace" with the victim. The victim had made threats against defendant and his family. Defendant and Mapps found the victim talking with two other men. Defendant approached the victim and his companions and apologized. When the victim began to yell at defendant, defendant became frightened. As defendant was talking with the victim, he saw one of the victim's companions pull a shotgun from the trench coat he was wearing. Defendant grabbed for the gun, and it fell to the ground in the struggle and discharged, striking the victim. Defendant never touched the trigger of the shotgun but handled only the butt and barrel. The victim's companions fled from the scene. After throwing the shotgun from the scene, defendant and Mapps also fled. Defendant was arrested by police several hours later.

Defendant tried to tell the police that there had been two other men at the scene, but the police told him to "shut up." The shotgun at the scene did not belong to defendant, and he did not have any intent to kill or cause harm to the victim. Defendant was trying to defend himself when the shotgun discharged.

On cross-examination, defendant stated that he came within three feet of the victim when he approached him, and did not see that the victim was carrying any weapon. Defendant maintained that he was not pointing the shotgun at anyone when it discharged. He admitted that he fled from the scene with Mapps and did not call the police to report the shooting.

Prior to opening statements at trial, the State presented a motion to require defense counsel to specify whether the theory of his defense would be accident or self-defense, as defense counsel had stated that either might be used. The court advised counsel that an affirmative defense such as self-defense must be set forth in his answer and further stated that both theories could not be used. The State argued to the court that self-defense invoked the defense of justification and related to an intentional, not accidental, shooting. Defense counsel argued in reply that the instant case involved elements of both self-defense and accident and that the circumstances of each defense were not inconsistent with those of the other. The court ruled that such affirmative defenses were inconsistent and that counsel would have to make an election between accident and self-defense. Counsel elected self-defense.

Thereafter, defense counsel moved for a mistrial. At a sidebar conference, counsel made an offer of proof of the victim's propensity for violence. The State argued in reply that defendant's testimony that the shooting was accidental foreclosed his claim of self-defense.

The court denied defendant's motion for a mistrial and ruled that all testimony as to the victim's prior bad acts should be excluded.

In rebuttal, Robert Sandifer testified that he witnessed the shooting and that he saw only three persons in the street at the time of the shooting. Collic Peer, a neighbor of the victim, similarly testified that there were only three persons in the street both before and after the shooting.

After closing argument, an instructions conference was held. Defense counsel requested instructions on voluntary manslaughter, self-defense, and involuntary manslaughter. These instructions were refused by the court, which found that the defendant's theory of defense, that the shooting was accidental and not intentional, precluded a claim of voluntary manslaughter and self-defense. The court found no evidence to allow an instruction on involuntary manslaughter.

At the sentencing hearing, the State in aggravation stated that the victim was unarmed and that defendant was on probation for a felony assault offense in the State of Washington at the time of the instant crime. In mitigation, defendant argued that he supported a "common-law wife" and two children. He also stated that he graduated from high school and completed a communications course in the United States Army prior to his discharge. He was subsequently sentenced to 40 years' imprisonment.

## I. Self-Defense

Robinson's first contention on appeal is that the trial court improperly ruled that his lack of intent to shoot the victim precluded his claim of self-defense, preventing him from presenting evidence in support of his case and denying him the right to a fair trial. He also maintains that the trial court erred in failing to instruct the jury on the law of self-defense.

At the time of the events underlying the offense charged against Robinson, section 9—2 of the Criminal Code of 1961 provided in relevant part as follows:

> "Voluntary manslaughter. (a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
>
> (1) The individual killed, or
>
> (2) Another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed.
>
> Serious provocation is conduct sufficient to excite an intense

passion in a reasonable person.

(b) A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code [Ill. Rev. Stat. 1983, ch. 38, par. 7—1 *et seq.*], but his belief is unreasonable." Ill. Rev. Stat. 1983, ch. 38, par. 9—2.

Section 7—1 of the Criminal Code provides:

"Use of Force in Defense of Person. A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." Ill. Rev. Stat. 1983, ch. 38, par. 7—1.

Robinson's first contention relates to the nature of self-defense and whether as an affirmative defense it can coexist with testimony that a charged homicide was unintended. Robinson testified that he intentionally struggled in self-defense with one person but that a resulting fatal gunshot wound to another person (the victim) was unintended.

■■ ■ Legally justified self-defense is the use by a nonaggressor of such force as that person reasonably believes is necessary for self-protection against another person's threatened, imminent, and unlawful force. (*People v. Harris* (1987), 154 Ill. App. 3d 308, 315, 506 N.E.2d 1353, 1358.) An instruction on the affirmative defense of self-defense should be given when there is some evidence in the record that, if believed by a jury, would support a self-defense claim. (*People v. Lockett* (1980), 82 Ill. 2d 546, 551, 413 N.E.2d 378, 381.) Instructions will not be justified that are wholly unrelated to the case and are based on the merest factual reference or witness' comment, but even a slight amount of evidence will raise the self-defense issue and justify an instruction. (*People v. Bratcher* (1976), 63 Ill. 2d 534, 540, 349 N.E.2d 31, 34; *People v. Jaffe* (1986), 145 Ill. App. 3d 840, 852, 493 N.E.2d 600, 609, *appeal denied* (1986), 112 Ill. 2d 586.) This is true even if the facts on which the defense is based are inconsistent with the defendant's own testimony, since the defendant is entitled to the benefit of any defense shown by the entire evidence. *People v.*

*Bratcher* (1976), 63 Ill. 2d 534, 540, 349 N.E.2d 31, 34.

■ Courts in Illinois and elsewhere appear divided as to whether a self-defense instruction is proper when a defendant testifies that a homicide or battery was accidental. (*E.g.*, compare *People v. Tanthorey* (1949), 404 Ill. 520, 89 N.E.2d 403 (instruction refused), with *People v. Brooks* (1985), 130 Ill. App. 3d 747, 474 N.E.2d 1287, *appeal denied* (1985), 106 Ill. 2d 556 (instruction given); see generally Annot., 15 A.L.R.4th 983 (1982); see also Annot., 55 A.L.R.3d 620 (1974).) The question has been posed in a more limited alternative form: whether such an instruction is proper when not only the defendant testifies to accident but also no other evidence of self-defense is in the record. (See *People v. Purrazzo* (1981), 95 Ill. App. 3d 886, 895, 420 N.E.2d 461, 468, *appeal denied* (1981), 85 Ill. 2d 572, *cert. denied* (1982), 455 U.S. 948, 71 L. Ed. 2d 661, 102 S. Ct. 1448.) Courts that refuse a self-defense instruction in such circumstances have done so at least partly on the ground that the defense of self-defense conflicts with that of accident. Yet, such cases disclose a "false conflict," in that no self-defense was actually shown on the facts, thus justifying no instruction thereon that could contradict an accident theory in the first place.

The apparently divided judicial opinion, in other words, can be explained by factual differences among the cases as to (1) whether all a defendant's acts immediately preceding the charged injury were alleged by the defendant to be accidental or nonforcible (as in *Tanthorey*), or (2) whether only the result itself was allegedly accidental while the preceding acts were alleged to be intentionally forcible and self-defensive (as in *Brooks*). In the first situation, which completely lacks intent or force prior to the injury, a defendant will understandably be held not to have shown self-defense, and a self-defense instruction ought to be precluded regardless of whether the resulting injury is "contradictorily" termed accidental. In the second situation, which involves intentional self-defense though unintended result, the intentional acts are the basis for a self-defense theory and instruction, but only for the purpose of supporting the ultimate defense theory of accident as to the charged injury itself.

### A. Cases of Accident But No Self-Defense

Cases involving the first situation are numerous. The court chooses to refer to them as "false conflict" cases.

For example, in *People v. Shelton* (1985), 140 Ill. App. 3d 886, 489 N.E.2d 879, *appeal denied* (1986), 112 Ill. 2d 566, the defendant contended that sometime after a violent argument with the victim during

which the defendant was injured, he approached the victim's house while armed with a knife. The defendant testified that he extended the knife in the victim's direction as the victim was charging at him and his brother, whereupon the victim accidentally "walked into the knife" though the defendant did not intend to stab the victim. (140 Ill. App. 3d at 890-91, 489 N.E.2d at 882-83.) The appellate court held that a self-defense instruction was properly refused because defendant was an aggressor on account of his armed approach (140 Ill. App. 3d at 891, 489 N.E.2d at 883) and because, "since it was defendant's position at trial that the stabbing was accidental, he cannot also argue that it was in self-defense" (140 Ill. App. 3d at 891, 489 N.E.2d at 883, citing *People v. Tanthorey* (1949), 404 Ill. 520, 89 N.E.2d 403, and *People v. Purrazzo* (1981), 95 Ill. App. 3d 886, 420 N.E.2d 461, *appeal denied* (1981), 85 Ill. 2d 572, *cert. denied* (1982), 455 U.S. 948, 71 L. Ed. 2d 661, 102 S. Ct. 1448). In *Shelton,* the defendant apparently would have had the jury believe that, at the relevant time, he never affirmatively used force against anyone but merely, without intending to stab, extended a knife into which the victim then ran. Thus, he was not initiating any "use of force" that would constitute self-defense in terms of the statute. (Ill. Rev. Stat. 1979, ch. 38, par. 7—1.) Moreover, no other witness testified as to facts that could support a self-defense theory. Accordingly, a self-defense instruction would have been unwarranted without regard to whether the defendant's trial theory characterized the death itself as accidental, suicidal, or of other origin.

In the principal case decided by our supreme court on the question, *People v. Tanthorey* (1949), 404 Ill. 520, 89 N.E.2d 403, cited by the *Shelton* court and by the State in the case at bar, the defendant testified that as he was suddenly accosted by the victim in a dark alley, he instantly flung up his hand to ward off any blow, and the gun he was carrying (which he was about to discard in the alley) somehow discharged. He testified that he did not immediately know that it had done so, and he did not intend to shoot. (404 Ill. at 525-26, 89 N.E.2d at 406.) No other witness testified to facts on which a self-defense finding could be based. In view of the defendant's accident testimony, the supreme court upheld the refusal of a self-defense instruction. (404 Ill. at 530, 89 N.E.2d at 408.) However, according to his testimony, the defendant in *Tanthorey* never affirmatively engaged in force—lethal or otherwise—against anyone, but merely raised his arm to ward off any force that might be directed at him. Force has been defined as " 'power, violence, compulsion, or constraint exerted upon or against a person or thing,' " or as " 'violence or *** threat or dis-

play of physical aggression toward a person ***.' " (*Landry v. Daley* (N.D. Ill. 1968), 280 F. Supp. 938, 954 & n.56, *appeal dismissed* (1968), 393 U.S. 220, 21 L. Ed. 2d 392, 89 S. Ct. 455, *rev'd on other grounds* (1971), 401 U.S. 77, 27 L. Ed. 2d 696, 91 S. Ct. 758 (construing the Illinois mob-action statute, section 25—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1967, ch. 38, par. 25—1)).) "Force" and "violence" are terms that "connote either physical attack upon person or property, or physical aggression reasonably capable of inspiring fear of injury or harm." (280 F. Supp. at 954.) "[T]he use of force or violence carries with it *sub silentio* a destructive or threatening intent." (280 F. Supp. at 955.) Thus, regardless of whether self-defense and accident were contradictory in *Tanthorey*, self-defense (in terms of an affirmative use of force against someone else) had not been shown in any event.

In another case cited by the *Shelton* court and by the State now— *People v. Purrazzo* (1981), 95 Ill. App. 3d 886, 420 N.E.2d 461, *appeal denied* (1981), 85 Ill. 2d 572, cert. *denied* (1982), 455 U.S. 948, 71 L. Ed. 2d 661, 102 S. Ct. 1448—evidence of self-defense was likewise lacking. In *Purrazzo*, the victim was hit by three bullets. The State showed that two spent bullets were recovered from the victim's body and two more from the floor. The defendant testified that he struggled with his wife, who was pointing a gun at him; during the struggle one shot was accidentally fired, which he did not think hit his wife; he pushed her away; he was now holding the gun; and while he was so holding it, his dog jumped at his arm and caused other shots to be fired. (95 Ill. App. 3d at 889-90, 420 N.E.2d at 464.) The trial court refused a self-defense instruction on the ground that the defendant's theory at trial was accident, and the appellate court upheld the refusal because "[w]here, by defendant's own testimony, a killing is accidental, instructions on *** justifiable use of force should not be given *unless there is some evidence from which the jury could find that the killing was the result of the threats or provocation that preceded it.*" (Emphasis added.) (95 Ill. App. 3d at 895, 420 N.E.2d at 468.) If the first shot did not hit the victim (as the defendant testified that he did not think it did), then it was the ensuing shots that hit her—shots that the defendant testified were fired by accident because of the dog's jumping at him. Based on the defendant's version, at the time these shots were fired any acts of self-defense had been completed, since he now possessed the gun, and his wife was sitting on the couch onto which she had been pushed. In addition, there was no other physical evidence or testimony that could support a finding of self-defense. Accordingly, the defendant was indeed relying on an ac-

cident theory as to the shots that undisputedly hit the victim, and thus, again, regardless of whether his proffered self-defense instruction would have been contradictory to the accident theory, he had failed to show that he was engaged in any intentional, self-defensive acts at the time the ensuing shots were fired—*i.e.*, at the time of "the shooting itself" or "the killing," to use the *Purrazzo* court's words. (95 Ill. App. 3d at 892, 893, 420 N.E.2d at 466, 467.) Moreover, in *Purrazzo*, the court recognized that a self-defense instruction is proper even though the defendant testifies that the killing was accidental, as long as there is some evidence from which the jury could find that the killing resulted from preceding threats or provocation. 95 Ill. App. 3d at 895, 420 N.E.2d at 468.

Again exemplifying "false conflict," evidence of self-defense was absent in *People v. Dzambazovic* (1978), 61 Ill. App. 3d 703, 377 N.E.2d 1077, *appeal denied* (1978), 71 Ill. 2d 619, which was another case of allegedly accidental shooting. The opinion upheld the trial court's refusal to give a self-defense instruction because "the evidence presented by the defendant did not raise the issue of self-defense." (61 Ill. App. 3d at 717, 377 N.E.2d at 1087.) The defendant had merely testified that, after the victim produced a gun and hysterically threatened to kill him and herself if he drove to meet her boyfriend, he grabbed for the gun and struggled with her over it. He had testified that the gun then went off accidentally while the victim was holding it, and he did not shoot her with the intention of killing her. In *Dzambazovic*, the force allegedly threatened by the victim was not imminent, since at most it was conditional on the defendant's driving to meet the boyfriend; furthermore, neither the defendant nor anyone else appears to have testified that the defendant initiated the struggle from a motive of self-defense. Thus, no self-defense was shown that either actually conflicted with the defendant's accident theory or justified a self-defense instruction.

In *People v. Holloway* (1985), 131 Ill. App. 3d 290, 475 N.E.2d 915, *appeal denied* (1985), 108 Ill. 2d 579, a trial court's refusal to give an instruction on self-defense or defense of another was likewise upheld. "A detailed review of the evidence" convinced the appellate court that the defendant's "entire defense was premised upon the theory that [the victim] was killed when the gun discharged during a struggle—an accident. Holloway claimed not to have intended to kill [the victim]." (131 Ill. App. 3d at 311, 475 N.E.2d at 931.) In addition, according to the defendant, it was he who repeatedly struck the victim with a hammer in the first place and precipitated the struggle; the gun that the victim allegedly possessed, and that ultimately shot

the victim during the resulting struggle, manifested itself only after the defendant admittedly made his hammer attack. (131 Ill. App. 3d at 311, 475 N.E.2d at 926.) In these circumstances, the defendant's resulting struggle with the victim could hardly have been characterized as justified use of force. Therefore, the defendant had failed to show the self-defense or defense of another that would support an instruction, whether or not such an instruction would conflict with the defendant's accident theory.

Any arguable conflict between accident and self-defense was also lacking in another case on which the State's brief relies, *People v. Chatman* (1982), 110 Ill. App. 3d 19, 441 N.E.2d 1292. In *Chatman*, the court upheld refusal of a self-defense instruction, stating that "there is nothing in the record to indicate that defendant could reasonably have believed that the use of deadly force was necessary to prevent great bodily harm to himself." (110 Ill. App. 3d at 23, 441 N.E.2d at 1296.) The victim testified that he was shot without cause while with his son; the defendant did not testify; and the most that the defendant's brother's testimony yielded on the point was that the victim was shot while struggling with the defendant, while the defendant's sister testified that she heard someone say that all he wanted to do was to leave with his son. (110 Ill. App. 3d at 21-22, 441 N.E.2d at 1294-95.) On these facts, no self-defense issue was raised that would justify an instruction, "contradictory" or not. The appellate court added that "if any inference can be made from the testimony concerning the discharge of the gun during the struggle, it is that the shooting was accidental, and an instruction on self-defense is not justified under such circumstance." 110 Ill. App. 3d at 23, 441 N.E.2d at 1296.

In so stating, the *Chatman* court cited *People v. Joyner* (1972), 50 Ill. 2d 302, 278 N.E.2d 756, in which two defendants' murder convictions were reversed and the cause remanded because of failure to give a voluntary-manslaughter instruction. In *Joyner*, while reversing and remanding, the supreme court rejected the defendants' contention that they should be discharged because of conclusively having showed self-defense. On that issue, the court noted that, though the victims were obviously the aggressors, the defendants' self-defense assertion was "somewhat at variance with their testimony"; that "[b]y its very nature [self-defense] relates to knowingly and intentionally using force to deter another and not to an accidental shooting"; and that the evidence was conflicting as to a struggle and as to who had one of the guns involved. The court observed that "[w]hether or not a killing is justified in a given case under the law of self-defense is ordinarily a

difficult determination to make where there are plausible facts which give rise to this defense." (50 Ill. 2d at 309-10, 278 N.E.2d at 760-61.) It seems clear that the supreme court was rejecting the contention that self-defense had been conclusively demonstrated, rather than rejecting the possibility that a self-defense theory as to struggle could coexist with an accident theory as to ultimate injury.

Likewise, the case of *People v. Jersky* (1941), 377 Ill. 261, 36 N.E.2d 347, which *Joyner* and subsequent opinions have cited, did not prohibit defenses of accident and self-defense from being raised as to respective events in the same homicidal episode. In *Jersky*, both accident and self-defense instructions were actually given by the trial court and approved by the supreme court, even while the supreme court criticized the defendant's trial strategy. (377 Ill. at 268, 36 N.E.2d at 350.) The defendant had testified that while he was holding a drawn gun and backing away from the victim, who had started hitting the defendant as the defendant was trying to break up a fight, the victim grabbed for the gun and the gun accidentally exploded as the victim was trying to twist it away from the defendant. The *Jersky* court stated that the defendant had offered a defense that "was multifarious and confusing and was probably so intended." (377 Ill. at 267, 36 N.E.2d at 350.) The defendant's evidence "was well calculated to confuse a jury, and he now complains because the jury was not confused." His self-defense theory "was wholly incompatible with the facts both proved and admitted. At the same time he presented a theory that the pistol was accidentally discharged, which, if true, would totally eliminate any theory of self-defense. If he acted in self-defense he must necessarily have fired intentionally, whereas if the pistol was accidentally discharged all questions of self-defense are out of the case." (377 Ill. at 268, 36 N.E.2d at 350.) Noting that the defendant had offered confusing defenses, the court wrote that "when this is attempted he places himself in a very poor position to complain of the court's rulings on the giving and refusing of instructions." (377 Ill. at 267, 36 N.E.2d at 350.) The trial court had given nine self-defense instructions and one on accident, which "fully, fairly and correctly instructed the jury as to the law in the case," and the court had correctly refused eight others that "were either argumentative or covered by other given instructions." 377 Ill. at 268, 36 N.E.2d at 350.

In *Jersky*, not only were self-defense and accident theories confusing and inconsistent on the basis of evidence in the record, but also self-defense was completely at odds with the facts proved, and "the defendant comes *** extremely close to convicting himself on his own

testimony." (377 Ill. at 266, 36 N.E.2d at 349.) The defendant Jersky did not testify that he voluntarily initiated any force at all against the victim, so that he did not show any self-defense that would arguably contradict his accident theory or actually require a self-defense instruction. Notwithstanding the court's statement that self-defense would have called for the defendant to "fire" intentionally, the *Jersky* court found no error in simultaneous self-defense and accident instructions, and its opinion should be read as disapproving an effort to mislead the jury through tortured defense theories and what it regarded as calculated untruths, rather than as holding self-defense and accident theories to be impermissible in a single case. Furthermore, the court has later affirmed that a defendant is entitled to an instruction based on the whole evidence, even if it conflicts with his own testimony. See, *e.g., People v. Bratcher* (1976), 63 Ill. 2d 534, 540, 349 N.E.2d 31, 34.

## B. CASES OF SELF-DEFENSE PLUS ACCIDENT

By contrast with the foregoing, other Illinois cases have held a self-defense instruction proper despite a defendant's accident theory. In these cases, there was evidence of self-defense in addition to evidence of accident; the defendant relied on an accident theory as to the ultimate injury *and* a self-defense theory as to his preceding acts.

For example, in *People v. Stewart* (1986), 143 Ill. App. 3d 933, 494 N.E.2d 1171, even though the defendant claimed to have stabbed the victim mistakenly, he testified that he did so while attempting to defend himself against two other persons who had attacked him. The appellate court held that a self-defense instruction should have been given, since, despite the allegedly accidental ultimate injury, the defendant had introduced evidence that he believed in the need to use force and thus he did not claim a "pure accident." (143 Ill. App. 3d at 935-36, 494 N.E.2d at 1173.) The court distinguished the facts from those in *Tanthorey, Purrazzo,* and *Bratcher,* which all involved "evidence that precluded any possibility of using self-defense as an affirmative defense." 143 Ill. App. 3d at 936, 494 N.E.2d at 1173.

In reference to a shooting preceded by a struggle over the gun and by an alleged threat by the victim against the defendant, the court noted in *People v. Buchanan* (1980), 91 Ill. App. 3d 13, 15, 414 N.E.2d 262, 264, that "[e]ven though the shooting occurred during and as a result of the struggle and was in that sense accidental, the preceding events could place the shooting in the context of self-defense." Accordingly, although harmless under the facts of the case, it was error to exclude evidence of the victim's character as to violence.

(91 Ill. App. 3d at 17, 414 N.E.2d at 265.) And in *People v. Cruz* (1978), 66 Ill. App. 3d 760, 384 N.E.2d 137, where the defendant apparently contradicted an eyewitness policeman and testified to an unintended killing as the result of a self-defensive struggle over a gun, the court wrote: "The fact that the defendant may have denied any intention to commit the act is *** irrelevant. [Citation.] And *** it is perfectly proper to charge the jury with inconsistent defenses so long as the facts and nature of the case support the feasibility of either. [Citation.]" The defendant was thus entitled to a self-defense instruction. 66 Ill. App. 3d at 764, 384 N.E.2d at 139.

Appropriately raised defenses of accident and self-defense in the same case were also allowed in *People v. Brooks* (1985), 130 Ill. App. 3d 747, 474 N.E.2d 1287, *appeal denied* (1985), 106 Ill. 2d 556. In *Brooks*, the defendant testified that he struggled with one victim's gun after the victim had fired two shots at him, and during the struggle two more shots were accidentally fired. The defendant testified that he was trying to take the gun away from the victim, that the victim had shot at him on a previous occasion, that he feared for his life during the present altercation, and that he wrestled with the victim over the gun for that reason. (130 Ill. App. 3d at 749-50, 474 N.E.2d at 1289.) Even though both victims disputed these assertions, the appellate court held that a self-defense instruction was proper on the basis of the defendant's testimony and that credibility was for the jury to determine. (130 Ill. App. 3d at 750-51, 474 N.E.2d at 1290.) As to the State's argument that the defendant could not claim self-defense and accident simultaneously, the court relied on *Buchanan* in stating its belief that, although the shooting itself could be termed accidental, "the preceding events *** could place the shooting in the context of self-defense." (130 Ill. App. 3d at 751, 474 N.E.2d at 1290.) The court also cited *Cruz* for the proposition that "no bar to the self-defense instruction arises in this case from a claimed lack of intent or from a possible inconsistent accident defense." (130 Ill. App. 3d at 752, 474 N.E.2d at 1290.) The *Brooks* court acknowledged the "different" view taken by other cases, including *Dzambazovic, Purrazzo,* and *Chatman*, but stated that, "based on the record before us" and the authorities the court was relying upon, it was reversible error not to have given the defendant's requested self-defense instruction. (130 Ill. App. 3d at 752, 474 N.E.2d at 1291.) However, as already noted, the evidence in *Dzambazovic, Purrazzo, Chatman,* and other cases did not raise a self-defense issue to begin with, so in that regard any view taken by such cases was not significantly "different" from that of the court in *Brooks*.

In *People v. Pietryzk* (1987), 153 Ill. App. 3d 428, 505 N.E.2d 1228, *appeal denied* (1987), 115 Ill. 2d 547, this court held that a voluntary-manslaughter instruction should have been given, despite the trial court's apparent conclusion that the defendant's testimony of sudden and intense passion was unworthy of belief and that since the defendant was urging self-defense "he could not pursue a conflicting theory." (153 Ill. App. 3d at 437, 505 N.E.2d at 1234.) In so holding, this court cited *Brooks* for the rule that a defendant is entitled to his theory of defense, even if the evidence on it is of doubtful credibility, as long as there is some such evidence. *Brooks* was also cited for having rejected an argument that a self-defense instruction was incompatible with the defendant's testimony of an ultimate accidental gunshot, and this court concluded: "The same result obtains herein. That defendant argued self-defense does not preclude a finding of intense passion. *** The facts herein would arguably support a jury finding of sudden and intense passion, and defendant was entitled to have the jury so instructed." *People v. Pietryzk* (1987), 153 Ill. App. 3d 428, 437-38, 505 N.E.2d 1228, 1234, *appeal denied* (1987), 115 Ill. 2d 547.

## C. This Case

■ In the case at bar, the State does not quarrel with *Pietryzk's* reasoning that a defendant is entitled to have the jury instructed on any defense or other offense disclosed by the evidence, even if inconsistent with the defendant's own testimony. The State merely contends that in the present case, the record contains no evidence to support instructions on justifiable use of force, voluntary manslaughter, or involuntary manslaughter. However, the State overlooks Robinson's testimony that he had become frightened by the victim's yelling at him and that as he then grabbed for the shotgun to defend himself and struggled over it with a companion of the victim, who had produced it, the shotgun fell and accidentally discharged, killing the victim.

The testimony of fright, defensive motive, shotgun, and struggle, if believed by the jury, would have been sufficient to support a finding of self-defense. Even "slight evidence of self-defense" will justify an instruction on the issue. (*People v. Scott* (1981), 97 Ill. App. 3d 899, 903, 424 N.E.2d 70, 72.) Moreover, the allegedly accidental nature of the ultimate gunshot does not vitiate the self-defense evidence as to the struggle that immediately preceded it. (*People v. Stewart* (1986), 143 Ill. App. 3d 933, 494 N.E.2d 1171; *People v. Brooks* (1985), 130 Ill. App. 3d 747, 474 N.E.2d 1287, *appeal denied* (1985), 106 Ill. 2d 556; *People v. Buchanan* (1980), 91 Ill. App. 3d 13, 414 N.E.2d 262;

*People v. Cruz* (1978), 66 Ill. App. 3d 760, 384 N.E.2d 137; see *People v. Pietryzk* (1987), 153 Ill. App. 3d 428, 505 N.E.2d 1228, *appeal denied* (1987), 115 Ill. 2d 547; see also *Agnes v. People* (1939), 104 Colo. 527, 93 P.2d 891 (claim of accidental killing while acting in self-defense against decedent's brother).) The evidence of self-defense immediately preceding the alleged accident distinguishes the instant case from others in which no such evidence had been offered and the refusal of a self-defense instruction was upheld. (See, *e.g., People v. Tanthorey* (1949), 404 Ill. 520, 89 N.E.2d 403; *People v. Purrazzo* (1981), 95 Ill. App. 3d 886, 420 N.E.2d 461, *appeal denied* (1981), 85 Ill. 2d 572, *cert. denied* (1982), 455 U.S. 948, 72 L. Ed. 2d 661, 102 S. Ct. 1448; *People v. Dzambazovic* (1978), 61 Ill. App. 3d 703, 377 N.E.2d 1077, *appeal denied* (1978), 71 Ill. 2d 619.) Accordingly, as in *Pietryzk* and in accordance with *Lockett*, the jury should have been given a self-defense instruction. Failure to give a self-defense instruction in such circumstances has been held to be reversible error (*People v. Scott* (1981), 97 Ill. App. 3d 899, 903, 424 N.E.2d 70, 72), and this court so holds in the case at bar.[1]

Though we are reversing the judgment and remanding the cause to the circuit court, we address other principal and subsidiary issues raised on appeal because of the possibility that they would reemerge on retrial.

In connection with self-defense, two subsidiary issues are whether evidence of the victim's character as to violence was properly excluded and whether the trial court properly prevented Robinson's trial counsel from referring in his opening statement to prior threats and acts of violence by the victim toward Robinson.

Other principal issues raised on appeal are whether instructions on voluntary and involuntary manslaughter were properly refused and

---

[1]The opinion in *People v. Mitchell* (1987), 163 Ill. App. 3d 58, rejects self-defense, voluntary-manslaughter, and involuntary-manslaughter instructions in a case in which a defendant alleged that he had intentionally struggled with a woman wielding a knife but that the ensuing fatal wound was accidental. However, in that case, the defendant's testimony did not clearly show that his struggle was to defend himself rather than simply to secure the knife. (*Cf. People v. Dzambazovic* (1978), 61 Ill. App. 3d 703, 377 N.E.2d 1077, *appeal denied* (1978), 71 Ill. 2d 619.) Moreover, a witness testified that the defendant had made statements to the witness that contradicted his testimony at trial. In addition, the victim's throat bore a long, deep slash, which was inconsistent with the alleged self-defense against a drunken but knife-wielding woman. In the case now *sub judice*, Robinson clearly testified to a self-defensive motive for struggling, no contrary statements on his part were introduced or testified to, and the victim's shotgun wound was entirely consistent with Robinson's version of events.

whether the cross-examination of two State's witnesses was properly limited.

(We do not decide a final issue raised on appeal: whether the trial court gave adequate consideration to Robinson's potential for rehabilitation when it sentenced him. This question was argued in Robinson's original brief though not raised in his petition for rehearing. In view of our reversal of the circuit court's judgment, we need not consider the sentencing issue now, as it has become moot.)

### D. Victim's Alleged Character For Violence

Robinson contends that the trial court improperly prevented his counsel from adducing evidence of the victim's character as to violence through testimony of prior threats and acts of violence by the victim toward Robinson and Robinson's family.

The State responds that Robinson was shown to be the aggressor and that since Robinson allegedly struggled with a third man who had a shotgun, any self-defense was performed against that man and could not serve as foundation for evidence of the victim's character. The State further contends that the victim was not shown to have offered any threats or violence against Robinson on the date of the killing and that, even if evidence of the victim's character was improperly excluded, it would have been cumulative, rendering such an error harmless, because the jury in fact heard Robinson himself testify that the victim had previously attacked him with a gun and threatened him and his family.

In reply, Robinson argues that the victim's alleged prior conduct toward him was relevant because it explains why he went to the victim's house to "make peace" and why he took seriously the threat implied in the alleged production of a shotgun by a companion of the victim who may have been the victim's "muscle." Robinson also argues that his own uncorroborated and "skeletal" testimony of prior threats and violence was less believable than that of other witnesses and thus such witnesses' testimony would not have been merely cumulative.

■■ When the theory of self-defense is raised, a victim's aggressive and violent character is relevant to show who was the aggressor. (*People v. Lynch* (1984), 104 Ill. 2d 194, 200, 470 N.E.2d 1018, 1020.) Such a victim's threats against a defendant are admissible even if they were not communicated to the defendant. (104 Ill. 2d at 201, 470 N.E.2d at 1020.) And "evidence of [an uncommunicated] threat by a third person is admissible as tending to show that the victim or the third person was the aggressor, and that the defendant acted in self-defense, where it is shown that the victim and the third person conspired or acted to-

gether against the defendant. [Citations.]" (1 Wharton's Criminal Evidence §207, at 434 (C. Torcia 13th ed. 1972).) In addition, if character traits of aggression or violence are known to the defendant, the knowledge necessarily affects his perceptions of and reactions to the victim's behavior and are thus relevant to the reasonableness of the defendant's self-defensive force. (*People v. Lynch* (1984), 104 Ill. 2d 194, 200, 470 N.E.2d 1018, 1020; accord *People v. Williams* (1977), 45 Ill. App. 3d 338, 359 N.E.2d 736.) In this area of proof, the defendant should be given substantial latitude. (*People v. Stombaugh* (1972), 52 Ill. 2d 130, 139, 284 N.E.2d 640, 645; *People v. Hoddenbach* (1983), 116 Ill. App. 3d 57, 60, 452 N.E.2d 32, 35.) However, before a defendant may introduce such evidence, evidence of self-defense must form a foundation. *People v. Allen* (1972), 50 Ill. 2d 280, 284, 278 N.E.2d 762, 765; *People v. Owens* (1977), 45 Ill. App. 3d 1012, 1018, 360 N.E.2d 481, 485.

In view of the previous discussion, it is clear that Robinson raised a self-defense issue that can coexist with his accident theory as to the ultimate gunshot. Thus, a foundation existed on which testimony regarding the alleged gunman's character for violence might have been offered. However, Robinson sought to offer such testimony as to the *victim's* character, on the twin theories that such character was relevant to Robinson's state of mind and that the alleged third man with a shotgun was the victim's accomplice or agent.

■ It is generally error to prevent a defendant from presenting direct evidence as to his state of mind regarding what he believed at the time he asserts he acted in self-defense. (*People v. Biella* (1940), 374 Ill. 87, 89, 28 N.E.2d 111, 112; *People v. Eshaya* (1986), 144 Ill. App. 3d 757, 765, 494 N.E.2d 772, 778, *appeal denied* (1986), 112 Ill. 2d 583; *People v. Diaz* (1976), 38 Ill. App. 3d 447, 458, 348 N.E.2d 199, 208, *appeal denied* (1976), 63 Ill. 2d 559.) In addition, it is generally a defendant's right to present evidence of a victim's character for violence when the defendant alleges that he acted in self-defense against the victim; the reason for the rule is that such evidence tends to show circumstances confronting the defendant, the extent of his apparent danger, and the motive influencing him. *People v. Davis* (1963), 29 Ill. 2d 127, 130, 193 N.E.2d 841, 843; see generally Annot., 1 A.L.R.3d 571 (1965).

■ Counsel have not cited nor has the court found any direct authority for inquiring into a victim's character when the act of self-defense was allegedly committed against a third person and the victim was killed unintentionally. Nevertheless, there is authority for allowing a defendant to present evidence of a third person's character on the question of which person in an affray was the aggressor, when the

third person is a common victim in the homicide for which the defendant is on trial and the defendant claims that he was defending himself against the third person. (See *People v. Moretti* (1955), 6 Ill. 2d 494, 129 N.E.2d 709, *cert. denied* (1958), 356 U.S. 947, 2 L. Ed. 2d 822, 78 S. Ct. 794.) There is also authority for presenting third-person character evidence in other proper circumstances. (See generally 40 C.J.S. *Homicide* §274 (1944); Annot., 1 A.L.R.3d 571, §9 (1965); *cf. State v. Kelly* (1923), 196 Iowa 897, 195 N.W. 614 (quarrelsome disposition of decedent's two brothers shown on claim of self-defense against them and decedent); *Magan v. Commonwealth* (Ky. 1909), 119 S.W. 734 (previous threats of co-enemy *B* shown on claim of self-defense against co-enemy *A*); *State v. Horseman* (1908), 52 Or. 572, 98 P. 135 (previous threats of *B* shown on claim of self-defense against *A* performed while *A* and *B* were jointly threatening defendant); *State v. Cassim* (1932), 112 W. Va. 92, 163 S.E. 769 (previous threats of *A*'s associates shown on self-defense against *A*).) In addition, under Robinson's theory that the victim and the alleged gunman were acting in concert to attack him, there is authority for a self-defense privilege on Robinson's part to defend himself against either person if he believed that he was in danger of serious injury or death from both. 40 C.J.S. *Homicide* §136 (1944); see *People v. Bush* (1953), 414 Ill. 441, 111 N.E.2d 326.

■ It is open to argument whether Robinson should have been allowed to show prior threats or violence by a putative nonattacker on the theory that such person was allegedly accountable as the principal or accomplice of another who was attacking Robinson. (See *People v. Seals* (1987), 153 Ill. App. 3d 417, 424-25, 505 N.E.2d 1107, 1112 (defendant was barred from presenting evidence of an *intentionally* shot victim's character when the self-defense would properly have been against victim's companion).) However, there seems to be no reason not to permit Robinson to avail himself of the general rule allowing him to show his state of mind while allegedly acting in self-defense; and prior threats by anyone, attacker or not, may be relevant to such state of mind. Therefore, Robinson should have been permitted to introduce his proffered evidence of prior threats and violence by the victim against him. And, as in *Hoddenbach*, the trial court erred in presuming that Robinson's testimony was substantially the same as his witnesses' testimony would have been. (*People v. Hoddenbach* (1983), 116 Ill. App. 3d 57, 61, 452 N.E.2d 32, 36.) Robinson's account could not have been as comprehensive or probatively as forceful as his witnesses' testimony, which therefore would not have been merely cumulative.

## E. Limitation of Opening Statement

Prior to opening statements, the State moved *in limine* to prevent defense counsel from referring in his opening statement to the background, attitude, or characteristics of the victim. The prosecutor argued that, because evidence of the victim's prior acts is not admissible on the issue of self-defense until a foundation of self-defense has been laid, and because no such foundation would have been laid at the time of opening statements, defense counsel should not be allowed to refer in his opening statement to the victim's prior history. Defense counsel replied that the purpose of opening statements is to outline the facts to be proved and that, because the victim's prior acts were to be proved on the issue of self-defense, he should be allowed to say so. The court's ruling was not explicit, but the record reveals that in substance the court advised defense counsel that he could inform the jury in his opening statement that self-defense would be raised as an affirmative defense,. but that he could not mention such evidence related to the defense as names, dates, or other details regarding the victim's prior history. Thereafter, in his opening statement, the prosecutor noted that self-defense would be raised and then concluded the statement with the remark: "I don't understand how a man unarmed, shot in the back, can raise the defense of self-defense." In his opening statement, defense counsel acknowledged that self-defense would be raised, asserted that there were "previous incidents" and "previous events" that "led up" to the fatal shooting, and stated.that these would be shown through "competent witnesses."[2]

"An opening statement should contain an outline of facts which a

---

[2]This issue was not set forth in either the "Points and Authorities" or the "Statement of Issues" section of Robinson's brief, despite the requirement of Supreme Court Rules 341(e)(1), (e)(3). (107 Ill. 2d Rules 341(e)(1), (e)(3).) Under former rules of court, such an omission from the brief could have been treated as a waiver. (*Collins v. Westlake Community Hospital* (1974), 57 Ill. 2d 388, 392, 312 N.E.2d 614, 615-16; *Department of Conservation v. First National Bank* (1976), 36 Ill. App. 3d 495, 505, 344 N.E.2d 11, 19, *appeal denied* (1976), 63 Ill. 2d 555.) However, under the current rule, a party's failure to set forth an issue in the "Points and Authorities" section does not result in a waiver if it is argued sufficiently in the "Argument" section of the brief. (*Collins v. Westlake Community Hospital* (1974), 57 Ill. 2d 388, 392, 312 N.E.2d 614, 615-16; *Summit Electric Co. v. Mayrent* (1977), 54 Ill. App. 3d 173, 178, 369 N.E.2d 319, 322-23; *Department of Conservation v. First National Bank* (1986), 36 Ill. App. 3d 495, 505, 344 N.E.2d 11, 19; *cf. Zeta Building Corp. v. Garst* (1951), 408 Ill. 519, 525, 97 N.E.2d 331, 335.) This issue was argued, with citations to authority, on two pages in the body of Robinson's brief. We therefore consider it, even though Rule 341(e) (107 Ill. 2d R. 341(e)), like other rules, should be followed. *Department of Conservation v. First National Bank* (1976), 36 Ill. App. 3d 495, 505, 344 N.E.2d 11, 19, *appeal denied* (1976), 63 Ill. 2d 555.

party in good faith intends to prove and should not be a long, narrative, evidentiary recitation. [Citation.] While its scope and latitude is largely within the discretion of the court [citation], the accused has the right to have his attorney present in opening statement the facts which he intends to prove, without unreasonable restrictions. [Citation.]" (*People v. Hampton* (1979), 78 Ill. App. 3d 238, 243, 397 N.E.2d 117, 121.) An opening statement is meant "to advise the jury concerning the questions of fact involved, so as to prepare their minds for the evidence to be heard. How full it shall be made, within reasonable limits, is left to the discretion of the attorney *** [but] [t]o relate the testimony at length will not be tolerated. *** The opening statement may be wrong as to some facts, and there is no requirement that it shall give all the facts of the case, which may turn out to be different from the statement." (*Pietsch v. Pietsch* (1910), 245 Ill. 454, 457, 92 N.E. 325, 326.) In an opening statement, "[c]ounsel may summarily outline what he expects the evidence admissible at the trial will show [citations], but no statement may be made in opening which counsel does not intend to prove or cannot prove." (*Gillson v. Gulf, Mobile & Ohio R.R. Co.* (1969), 42 Ill. 2d 193, 197, 246 N.E.2d 269, 272; see ABA Standards, The Defense Function §7.4 (1971).) "[A]n opening argument can include a discussion of matters that may reasonably be inferred from the evidence" (*People v. Warmack* (1980), 83 Ill. 2d 112, 126, 413 N.E.2d 1254, 1260), but "it is improper, with foreknowledge, to include matters in an opening statement which are not thereafter proved" (*People v. Roberts* (1981), 100 Ill. App. 3d 469, 476, 426 N.E.2d 1104, 1109; accord *People v. Warmack* (1980), 83 Ill. 2d 112, 125, 413 N.E.2d 1254, 1260; *People v. Weller* (1970), 123 Ill. App. 2d 421, 427, 258 N.E.2d 806, 809).

A self-defense claim and alleged prior threats by the deceased were discussed in *People v. McDowell* (1918), 284 Ill. 504, 120 N.E. 482, where the supreme court wrote: "[C]ounsel was proceeding to state what he proposed to prove and was not arguing the case ***. Counsel had a right, in his opening statement ***, to state briefly, within reasonable limits, the facts defendant relied on and expected to prove in his defense. It is an important right to a defendant in a criminal case that his counsel shall not be prevented or unreasonably hindered by the court in the performance of his duty at every stage of the trial, within the requirements of the law. The court erred in denying defendant this right." 284 Ill. at 511, 120 N.E. at 485.

Opening statements sometimes refer to evidence that may later prove to be inadmissible, and in so doing they do not necessarily present grounds for reversal. (*Miller v. John* (1904), 208 Ill. 173, 177,

70 N.E. 27, 28; *People v. McShan* (1975), 32 Ill. App. 3d 1068, 1071-72, 337 N.E.2d 262, 267; *cf. People v. Carini* (1986), 151 Ill. App. 3d 264, 502 N.E.2d 1206, *appeal denied* (1987), 114 Ill. 2d 548.) It would be improper for Robinson's counsel in an opening statement to recite excessive details as to the alleged prior bad acts of the victim toward Robinson; however, the contents of opening statements cannot be made to depend merely on the yet-undetermined question of admissibility of the evidence to which they refer, even though it would be appropriate for the trial court to caution the jury neutrally that counsel's statements are not evidence.

## II. VOLUNTARY MANSLAUGHTER

■ Robinson also contends that the trial court erred in refusing an instruction on voluntary manslaughter.

When a self-defense instruction is warranted, an instruction tendered by the defendant on voluntary manslaughter is also required, since the existence of a subjective but unreasonable belief in the need for self-defensive force can lead to a voluntary-manslaughter conviction. (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(b); *People v. O'Neal* (1984), 104 Ill. 2d 399, 405, 472 N.E.2d 441, 443; *People v. Bell* (1987), 152 Ill. App. 3d 1007, 1015, 505 N.E.2d 365, 371, *appeal denied* (1987), 115 Ill. 2d 544.) While error in refusing such an instruction on voluntary manslaughter may be harmless where the evidence of guilt of murder is so overwhelming that "the result of the trial would not have been different if the instruction had been given" (*People v. Moore* (1983), 95 Ill. 2d 404, 410, 447 N.E.2d 1327, 1330), this is not such a case, in respect to either a self-defense or a voluntary-manslaughter instruction.

If properly instructed, the jury could have believed Robinson's testimony about the need to use self-defensive force against a man with a shotgun. At that point, its verdict could have acquitted him altogether, or the jury could have concluded that Robinson believed in the need for self-defense but that his belief was unreasonable, in which case it could have convicted him of voluntary manslaughter. This is so, because when one nonrecklessly uses justified self-defensive force against *A* that unintentionally kills *B*, one is relieved of liability for *B*'s death; but if the force against *A* is unjustified and it kills *B*, even though unintentionally, one is liable for *B*'s death. (*People v. Adams* (1972), 9 Ill. App. 3d 61, 291 N.E.2d 54.) Accordingly, refusal of a voluntary-manslaughter instruction in the case at bar fundamentally limited the jury's options in deciding the case on the evidence, and it cannot be said that the trial's outcome would have been the same

with the instruction. Thus, we hold that it was reversible error to refuse the voluntary-manslaughter instruction.

### III. INVOLUNTARY MANSLAUGHTER

Robinson also urges on appeal that an involuntary-manslaughter instruction should have been given, on the theory that the evidence raised a fact issue as to recklessness that the jury should have been allowed to determine. In this connection, Robinson cites *People v. Sibley* (1981), 101 Ill. App. 3d 953, 428 N.E.2d 1143, *appeal denied* (1982), 91 Ill. 2d 556, which reversed a conviction of attempted murder, aggravated battery, and armed violence because no instruction on the lesser offense of reckless conduct was given. *Sibley* involved a struggle by two persons over a gun, during which a third person was struck by a gunshot. In *Sibley*, it was the defendant who had produced the gun and threatened the second person, whereupon the threatened second person grabbed the gun and the struggle ensued. Under such circumstances, a jury might reasonably have found the defendant's conduct to be reckless. However, in the case at bar, Robinson testified that it was not he but another who produced the gun and that Robinson was the person struggling in self-defense. Thus, *Sibley* is distinguishable, and the instant case does not present the same immediacy of a potential recklessness finding against the defendant that *Sibley* presented.[3]

Even so, an involuntary-manslaughter instruction was required. Credible evidence that would reduce murder to manslaughter requires a manslaughter instruction. (*People v. Joyner* (1972), 50 Ill. 2d 302, 278 N.E.2d 756.) If the jury in the case at bar had been properly instructed and were to have found that the struggle to which Robinson testified did occur, he might have been acquitted of all charges because of justified self-defense or might have been convicted of voluntary manslaughter because of an unreasonable belief in the need for self-defense. To convict of voluntary manslaughter, however, such a jury would be required to have found that Robinson, directly or through transferred intent, killed the victim knowingly and intention-

---

[3]We note that in their petition for rehearing, counsel for Robinson also cite one of this court's unpublished orders in another case. The order was entered under Supreme Court Rule 23 (107 Ill. 2d R. 23), which provides that such orders are not precedential and that when, for certain specified purposes, they are invoked, a copy thereof shall be furnished opposing counsel and the court. In this case, besides no copies having been furnished, the order was not invoked for one of the specified purposes; since the order is not precedential, counsel's citation to it has not been considered.

ally. (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(b).) If such a jury had found an unreasonable belief in the need for self-defense and had found that the acts so motivated did occur, but nevertheless had found the killing to be merely accidental, it might still have returned a verdict of acquittal (*People v. Santiago* (1982), 108 Ill. App. 3d 787, 802, 439 N.E.2d 984, 994, *appeal denied* (1982), 91 Ill. 2d 556); but, alternatively, it could have convicted Robinson of involuntary manslaughter, if it found that he killed unintentionally while recklessly performing acts likely to cause death or great bodily harm (Ill. Rev. Stat. 1985, ch. 38, par. 9—3(a)). Recklessness is a question of fact to be decided under all the circumstances as presented to the jury. (*People v. Johnson* (1975), 33 Ill. App. 3d 168, 174, 337 N.E.2d 240, 244, *appeal denied* (1976), 62 Ill. 2d 590.) To justify an involuntary-manslaughter instruction, there must be some evidence of recklessness, though intentionally and deliberately aiming and firing does negate recklessness. (*People v. DeMumbree* (1981), 98 Ill. App. 3d 22, 25, 424 N.E.2d 73, 75; *People v. Burnette* (1981), 97 Ill. App. 3d 1015, 1019-20, 423 N.E.2d 1193, 1198, *appeal denied* (1981), 85 Ill. 2d 568.) A jury is entitled to decide between accident and recklessness. *People v. Schwartz* (1978), 64 Ill. App. 3d 989, 993, 382 N.E.2d 59, 63, *appeal denied* (1979), 72 Ill. 2d 584.

The State cites *People v. Ward* (1984), 101 Ill. 2d 443, 451, 463 N.E.2d 696, 699, for the proposition that an involuntary-manslaughter instruction should be denied if there is no evidence that would reduce murder to manslaughter. The State contends that there was no such evidence in the instant case. However, in *Ward*, the defendant denied even touching, much less beating, the victim, which if true should have served to acquit him completely rather than to raise a recklessness issue, and in any event the beating's severity "negate[d] any suggestion that his conduct was only reckless." 101 Ill. 2d at 451, 463 N.E.2d at 700.

The State also cites *People v. Harris* (1980), 90 Ill. App. 3d 703, 705, 413 N.E.2d 499, 501, *appeal denied* (1981), 85 Ill. 2d 570, as establishing that a defendant's denial of any intent to harm does not compel the conclusion that he merely acted recklessly; but in *Harris* the defendant aimed and fired five shots at the victim, and any contention that he meant no real harm or was merely reckless because he thought the gun contained blanks was belied by the fact that, according to him, the victim fell after the second shot, yet defendant continued shooting. 90 Ill. App. 3d at 705, 413 N.E.2d at 501.

In the case at bar, Robinson testified that he struggled over a gun that he assumed was loaded and that as a result of the struggle the

gun discharged, killing the victim despite Robinson's lack of intention to kill. Only one shot was proved, which does not negate recklessness. If the jury chose to believe him as to the foregoing but did not believe that he thought he was acting in self-defense, it might nevertheless have believed that his actions were reckless, which would support an involuntary-manslaughter conviction. The State here concedes that Robinson is entitled to instructions applicable to any facts the jury might legitimately find from the evidence proved. *People v. Fryman* (1954), 4 Ill. 2d 224, 231, 122 N.E.2d 573, 577.

This is not a case like *People v. DeMumbree* (1981), 98 Ill. App. 3d 22, 424 N.E.2d 73, where the defendant's evidence showed that he had intentionally fired three shots in the directions of various people and where accordingly there was no showing of mere recklessness that would justify an involuntary-manslaughter instruction. In the case at bar, Robinson's evidence is that he did not control or point the gun or intentionally fire the fatal shot, and recklessness might be inferred by the jury from the fact that he struggled over the gun while assuming that it was loaded. As in *People v. Santiago* (1982), 108 Ill. App. 3d 787, 439 N.E.2d 984, *appeal denied* (1982), 91 Ill. 2d 556, Robinson's self-defense theory is not inconsistent with an involuntary-manslaughter instruction, since "in defending oneself *** one does not invariably intend to kill or cause great bodily harm" (108 Ill. App. 3d at 803, 439 N.E.2d at 995), and the alleged struggle over a loaded gun is comparable in its arguable recklessness to the *Santiago* defendant's alleged firing at an empty car in the hope of igniting a gasoline tank and diverting assailants from attacking his friends.

Accordingly, the trial court should have given Robinson's tendered involuntary-manslaughter instruction to the jury. Without such an instruction the jury, if it were otherwise properly instructed and if it then rejected Robinson's self-defense claim, would have been put to a choice of convicting him at least of voluntary manslaughter or acquitting him completely, even though there was evidence from which, if given the instruction, it could have found recklessness and could have convicted him of involuntary manslaughter. Thus, failure to give the instruction was reversible error, as in *Santiago*. 108 Ill. App. 3d at 803, 439 N.E.2d at 995.

## IV. CROSS-EXAMINATION

■ Robinson also contends that the trial court denied him his right to confrontation in restricting cross-examination of two State's witnesses as to a conversation in which one of the witnesses, Charles Woods, allegedly requested the other witness, Marvella Sandifer, to

testify against Robinson. Robinson asserts that he wished to show that Woods might have coerced Sandifer into giving her testimony.

Although the scope of cross-examination is generally within the trial court's discretion, the widest latitude should be allowed the defendant for the purpose of establishing bias, motive, or interest on the part of the witness. (*People v. Foley* (1982), 109 Ill. App. 3d 1010, 1014, 441 N.E.2d 655, 659.) Moreover, where the defendant's theory is that the prosecution's witness is unbelievable, it is error not to allow cross-examination on matters that would reasonably tend to show bias, interest, or motive to testify falsely. (*People v. Phillips* (1981), 95 Ill. App. 3d 1013, 1020, 420 N.E.2d 837, 842, *appeal denied* (1981), 85 Ill. 2d 572.) However, evidence of bias, interest, or motive must not be remote or uncertain, because the evidence must potentially give rise to the inference that the witness has something to gain or lose by his testimony. *People v. Crosser* (1983), 117 Ill. App. 3d 24, 29, 452 N.E.2d 857, 862; *People v. Phillips* (1981), 95 Ill. App. 3d 1013, 1020, 420 N.E.2d 837, 842, *appeal denied* (1981), 85 Ill. 2d 572.

In *Foley*, where a defendant sought to cross-examine a State's witness as to whether he was on probation at the time of trial, the defense theory was that the witness was biased because he might be vulnerable to official pressure, real or imagined, in connection with continuing his probationary status. The trial court barred the cross-examination on the ground that evidence must first be shown that an agreement had been reached for the witness to receive probation in exchange for his testimony in the case. (*People v. Foley* (1982), 109 Ill. App. 3d 1010, 1014, 441 N.E.2d 655, 656-57.) In reversing, the appellate court wrote: "[I]t is clear the admissibility of this type of impeachment is not dependent on whether defense counsel can prove beforehand that promises of leniency had been made or any expectations of special favor existed in the witness' mind. [Citations.] We believe it was error for the cross-examination *** to have been so restricted that the defense was unable to explore the possibility that the witness may have been biased or testifying falsely." (109 Ill. App. 3d at 1015, 441 N.E.2d at 659, citing *Davis v. Alaska* (1974), 415 U.S. 308, 316-17, 39 L. Ed. 2d 347, 354, 94 S. Ct. 1105, 1110).) The *Foley* court went on to hold that because the witness in question was a key witness, the trial court's error in restricting cross-examination was prejudicial and not harmless beyond a reasonable doubt. 109 Ill. App. 3d at 1016, 441 N.E.2d at 660.

Likewise, in *Phillips*, the trial court barred cross-examination of a police officer as to his record of 15 suspensions for purposes of showing that he may have been motivated to testify falsely about actions

he took before being shot by the defendant. In reversing, the appellate court noted that "[t]he trial court has no discretionary power to deny the defendant the right to cross-examine the witness to show interest, bias, or motive. [Citations.]" *(People v. Phillips* (1981), 95 Ill. App. 3d 1013, 1020, 420 N.E.2d 837, 842.) Although acknowledging that the sought-after evidence of bias must not be remote or uncertain, the court found that it was not remote because the officer could have been motivated to testify falsely to avoid further suspensions or termination or to ensure the continuation of his medical benefits. The court also rejected the State's arguments that cross-examination could have inquired into whether the officer was currently under suspension, and that the jurors already knew that if the officer testified falsely he could be disciplined. The court was "not convinced that the inference of [the officer's] possible motive to testify was clear to the jury. [Citation.] *** [E]ven if the jury were aware of [the officer's] possible bias, interest or motive to testify, it was for the jury to decide whether the past suspensions provided [him] with a further motive to offer false testimony. [Citations.]" 95 Ill. App. 3d at 1022-23, 420 N.E.2d at 844.

In the instant case, the jury was allowed to hear that the victim's brother, Woods, had asked Sandifer to testify and that she had not come forward with information previously. On cross-examination, the brother denied that he or the victim belonged to a street gang. These facts alone do not convincingly show that the jury was already aware of Sandifer's hypothetical motive to testify falsely because of threats that may have been made against her through Woods. Contrary to the State's contention that such evidence would have been remote, if Robinson's counsel had been able to establish such threats through further cross-examination, a powerful motive to testify falsely would have presented itself to the jury. Moreover, Robinson's counsel need not first have shown that threats were made before he inquired as to the nature of conversations between the witnesses. Accordingly, Robinson's counsel should have been allowed to probe through cross-examination for any such evidence of motive or bias.

Though on rebuttal Sandifer's husband and another neighbor of the victim supported the testimony of Mrs. Sandifer and the victim's brother as to the circumstances preceding and following the shooting, Mrs. Sandifer and the brother were the only witnesses to testify that they saw the actual shooting. They were obviously key witnesses, and it cannot be said that the error in restricting cross-examination of them was harmless beyond a reasonable doubt. *People v. Foley* (1982), 109 Ill. App. 3d 1010, 1016, 441 N.E.2d 655, 660.

For the foregoing reasons, the judgment of the trial court is reversed and the cause remanded to the circuit court of Cook County for further proceedings.

Reversed and remanded.

HARTMAN and BILANDIC, JJ., concur.