Fourth Division
 May 1, 1997









No. 1-96-1012

THE PEOPLE OF THE STATE OF ILLINOIS, ) APPEAL FROM THE
 ) CIRCUIT COURT OF
 Plaintiff-Appellee, ) COOK COUNTY.
 )
 v. )
 )
GABRIEL BEDOYA, ) HONORABLE
 ) BERTINA LAMPKIN,
 Defendant-Appellant. ) JUDGE PRESIDING.


 PRESIDING JUSTICE WOLFSON delivered the opinion of the 

court:

 Gabriel Bedoya (Bedoya) and John Koch (Koch), both Milwaukee
police officers, came to Chicago on May 26, 1994, for a night out
on the town. Before the night was over, the Claridge and
Ambassador Hotels and the Cardinal's residence were riddled with
gunshots. A bouncer at the Dynasty Lounge was dead. Whether
Bedoya was to be held responsible for these events was at issue
at his trial.
 Bedoya was charged with four counts of aggravated discharge
of a firearm and one count of first degree murder as a result of
the events of May 26 and 27, 1994. A jury found him guilty of
murder, but not guilty on the remaining counts. Bedoya was
sentenced to 30 years imprisonment. It is from this conviction
and sentence that he appeals.
 He raises as issues: (1) whether the trial court erred by
refusing to allow Bedoya to present evidence of the victim's past
acts of violence, when self-defense was raised and the jury was
instructed on self-defense, and (2) whether Bedoya's defense for
first degree murder was substantially prejudiced by the trial
court's refusal to sever the counts for aggravated discharge of a
firearm. We reverse and remand for a new trial.
FACTS
 At trial, the State's first witness was Beatriz Rodriguez
(Beatriz). She testified that she had been the wife of Jose
Julian Rodriguez (Rodriguez), who was shot on May 27, 1994, while
he was working as a bouncer at the Dynasty Lounge at 5447 N.
Lincoln in Chicago. Beatriz testified that in the early morning
hours of May 27, 1994, at about 2 a.m., she called the public
phone located in the entranceway of the Dynasty bar. While she
was speaking with her husband, he stopped the conversation and
asked her to hold. At first, Beatriz heard nothing, then she
heard some noises and heard someone say, "What's wrong with him? 
He's bleeding." When Rodriguez did not return to the phone,
Beatriz hung up and called the Dynasty bar's main phone. She
spoke with the bartender and learned that her husband had been
shot. 
 Beatriz said that she drove to the bar immediately, but the
police would not let her see her husband. The next time she saw
Rodriguez, she identified his body at the morgue.
 Carlos Varela, a Chicago patrol officer for the 20th
District, testified that he had been at the Dynasty Lounge on the
evening of May 26, 1994. He got off work at about 11 p.m. and
went to have some drinks before going home. He was at the bar
for about an hour and, he said, the bar was rather empty.
 Varela testified that he saw Bedoya, whom he had known for
15 or 16 years. Though Bedoya grew up in Chicago and had family
here, Varela knew that Bedoya was a Milwaukee police officer. 
Bedoya came over to say hello and introduced Varela to his
companion, Koch, whom Varela had never seen before. Bedoya
introduced him as "a co-worker."
 Bedoya asked Varela if he could suggest a bar where there
was music and more action. Varela told them about a bar
downtown. Bedoya and Koch left the Dynasty. Varela did not see
them again that night.
 At 2:30 or 2:45 a.m., however, Varela received a phone call
from a Chicago police detective. Because of the call, Varela
went back to the Dynasty bar around 3 a.m. and spoke with
detectives who were there investigating a shooting. He told the
detectives Bedoya's name, the name of a bar belonging to Bedoya's
uncle, and other information about Bedoya.
 On cross-examination Varela denied that he saw Bedoya
carrying a gun the night of May 26, 1994. He said that when
Bedoya first became a Milwaukee police officer Bedoya came to
Varela's Chicago police station wearing his gun. Varela told
Bedoya at that time that he could not carry a gun in Chicago. 
 Koch testified for the State at Bedoya's trial. He told the
jury that he had been dismissed from the Milwaukee police force
after he pled guilty to the offenses of aggravated discharge of a
firearm, obstruction of justice, and aiding a fugitive, in
relation to the events of May 26 and 27, 1994. He also admitted
that he had a charge of criminal damage to property pending
against him in Wisconsin in relation to an incident involving an
ex-wife.
 Koch testified that he and Bedoya became friends after being
partners on the Milwaukee police force. In May 1994 Bedoya and
Bedoya's girlfriend were living with Koch in Koch's condo in
Milwaukee. At about 8:30 p.m., on the evening of May 26, 1994,
Koch and Bedoya left Milwaukee and arrived in Chicago at about 10
p.m. They drove to Chicago in Koch's red Toyota Camry. Koch
said they planned to stay at Bedoya's mother's home in Chicago
after enjoying themselves at some bars in Chicago.
 Before leaving Milwaukee, Koch said, both he and Bedoya
drank 4-5 gin and tonic cocktails. On the way to Chicago, they
bought a six-pack of beer and shared it.
 Both Koch and Bedoya came to Chicago wearing their service
weapons, .40 caliber Glock semiautomatic pistols. Koch wore his
concealed in an off-duty holster worn in the small of his back. 
Bedoya wore his weapon in a regulation off-duty, side holster. 
 Their first stop on arriving in Chicago was the Casanova
Lounge, a bar run by Bedoya's uncle. Koch testified that he and
Bedoya were drinking gin and tonic that night. They each had two
drinks at the Casanova. After leaving the Casanova bar, they
drove to the Dynasty Lounge. There was a bouncer at the door who
checked ID's and frisked people for weapons. Koch said that
Bedoya showed the bouncer his badge and told him that they were
police officers. The bouncer let them into the bar with their
weapons.
 Inside the bar, Bedoya saw a friend, Carlos Varela, who was
a Chicago police officer. Bedoya asked Varela to suggest the
name of a bar with good music, since the Dynasty was rather
empty. Varela suggested Mother's Lounge. Koch and Bedoya left
the Dynasty and Bedoya began to drive to Mother's.
 On the way to Mother's Lounge, Koch said, he placed his gun
in the glove compartment because he "wasn't comfortable." Bedoya
drove the car through an area where prostitutes were walking
along the street. Koch directed Bedoya to stop. He picked up a
prostitute and paid her $10 for her to perform an act of oral sex
on him in the back of the car. Bedoya drove the car while Koch
and the prostitute were in the back seat. Because Koch had
difficulty maintaining an erection, he told the prostitute to get
out of the car. Koch and Bedoya then continued on their way to
Mother's Lounge.
 At Mother's, Koch said, he and Bedoya had 2-3 drinks. Koch
said that he danced and watched other people dancing. At some
point, however, they decided to leave Mother's. As they walked
to their car, Koch said, Bedoya pulled out his weapon and shot at
the ground twice. Koch said that he asked Bedoya why he was
shooting and Bedoya just laughed and said, "This is a city,
they'll never catch us."
 Bedoya drove again. Koch was tired and began to doze off. 
The next thing he remembered, Koch said, he woke up to see Bedoya
reaching across the car in front of him, shooting out of the
passenger window of the car. Koch said this happened several
times but he did nothing to stop Bedoya.
 After shooting at several buildings, Bedoya drove back to
the Dynasty Lounge. Koch and Bedoya went inside and had one
drink. Koch said that he was sitting at the bar when he realized
that Bedoya had gotten up and was leaving. He started to follow. 
When he got outside he saw that Bedoya and the bouncer were
fighting and shouting at each other in Spanish, which Koch did
not understand. Koch said he tried to hold on to the bouncer's
arms to pull him off Gabe, but got "shrugged off." When he tried
to grab the bouncer again, he heard a gunshot. The bouncer, Koch
said, said something in Spanish, let go of Bedoya, and turned
around and walked back toward the bar. Because of his position,
Koch had not seen the gun and did not know who was holding the
gun when it fired.
 Koch testified, however, that after the bouncer walked away
he noticed Bedoya holstering his weapon and walking at a fast
pace up the street. When Koch caught up with him, Bedoya said,
"I shot the m----- f-----. We've got to get out of here." Koch
then went to get the car, drove to where Bedoya was standing, and
picked him up. Koch said that he heard sirens and saw emergency
lights flashing as he drove away from the area near the Dynasty
Lounge.
 After leaving the Dynasty Lounge, Bedoya suggested that they
switch places. Bedoya drove. After that, said Koch, he had
absolutely no recollection of anything until he awoke the next
morning in his car in the parking lot of his condo in Milwaukee. 
He woke up when a Milwaukee police officer opened the car door he
had been leaning on and he started to fall out of the car. He
noticed that there were several officers and detectives around
the car. Koch was arrested. The detectives retrieved Koch's
service weapon from the glove compartment.
 Koch admitted that when he awoke he was covered with vomit
from throwing up on himself and his pants were urine-soaked.
 On cross-examination Koch denied that he had been the one
shooting out of the passenger window at the buildings. He could
not explain, however, how a bullet hole got in the arm rest of
the passenger side of the car.
 Koch also said that he was 5'9" tall and he recalled the
bouncer being taller than he was.
 The bartender at the Dynasty, Jose Marin Lopez, testified
with the help of a Spanish interpreter. He said that he had been
a bartender at the Dynasty for seven years and was there on May
26, 1994. He saw Carlos Varela speaking with two men Lopez did
not know. These men ordered one drink and then left.
 Around 2 a.m., the two men he had seen with Varela earlier
came back into the bar. They ordered a drink and stayed for 10
or 15 minutes. When they left the bar, Lopez noticed that there
was only one glass left on the bar.
 Lopez testified that he noticed Rodriguez talking on the
phone in the front entranceway of the bar around the time that
the two men came back to the bar. Later, when the two men left,
he was surprised when he looked through the front window and saw
Rodriguez outside. Lopez said that he went outside to see what
was going on. He saw Rodriguez "battling" with the two men who
had been in the bar. Rodriguez was up against a car, he said,
and Bedoya had a gun in his hand. Koch was behind Rodriguez. 
According to Lopez, Bedoya was holding the gun in the air and was
trying to force it down. Rodriguez was holding Bedoya's wrist,
trying to push the gun away.
 Lopez said that he ran inside the bar and told the disc
jockey to call the police. Before he could get back outside, he
heard a shot. The next thing he saw was Rodriguez walk in
through the front door and fall on his face to the floor. The
police and an ambulance arrived soon after. Later that same
morning, Lopez traveled with some Chicago police detectives to
Milwaukee, where he viewed a line-up and identified Bedoya as the
man he had seen with the gun.
 The rest of the evidence produced at trial by the State
concerned the shootings that occurred at the Ambassador and
Claridge Hotels and the Cardinal's residence. In addition to
testimonial evidence from several witnesses, the State offered
into evidence the recovered bullet casings and numerous
photographs of the damage to the buildings. No one, however,
testified to actually seeing the shootings take place. No one
was able to say whether it was Bedoya or Koch who had been
shooting from the passenger window of the car. The evidence
established that the shots fired at the buildings, as well as the
shot that killed Rodriguez, were all fired from Bedoya's gun.
 Assistant Cook County Medical Examiner Dr. Nancy Jones
testified that she performed an autopsy on the body of Jose
Julian Rodriguez on May 27, 1994. From her examination of the
body she determined that he was a 23-year-old, Hispanic male,
weighing 214 pounds. He was 5'7" tall.
 Rodriguez died as a result of a single, through and through
gunshot wound to the chest. The bullet passed through the left
lobe of the liver, the stomach, the diaphragm, the pericardium,
the heart, and the lung. The bullet traveled through the body in
a straight and level path, slightly angled from right to left. 
There was charring at the entrance site, indicating that the shot
had been "close contact."
 The body also showed some evidence of blunt trauma to the
face and neck. There was a laceration at the left temple, a
laceration inside the upper lip, a bruise on the inside of the
lower lip, exterior abrasions of the lips, and a linear scratch
on the neck.
 On cross-examination, the medical examiner said that some of
these injuries were consistent with Rodriguez' fall to the ground
after being shot.
 Rodriguez's blood was tested. His blood alcohol content was
.33 mg., he had no cocaine in his system, but his blood did show
the presence of .17 micrograms of benzoylecgonine, a by-product
of cocaine. Dr. Jones said that without knowing the amount of
cocaine Rodriguez had ingested she could say only that it had
been at least one hour, but could have been up to 24 hours, since
he ingested the cocaine.
 For his defense, Bedoya produced Lesa Northam as a witness. 
She said that she was a Highland Park police officer and, in the
early morning hours of May 27, 1994, she stopped a red car
driving on the Edens Expressway because she felt it was following
another car too closely. Northam said that she pulled up behind
the vehicle and activated her lights, but the driver of the car
did not pull over. He stuck his arm out the window and displayed
a badge. Northam tapped her sirens and the car then pulled over.
 Northam said that there were two people in the car. She
asked the driver, whom she identified as Bedoya, if he had a
valid picture identification for the badge and Bedoya produced
this. She noticed the passenger was slumped over, his head was
between his knees, and he smelled of alcohol and vomit. She
asked the driver if he, too, had been drinking and Bedoya
admitted that he had. She then administered a field sobriety
test to Bedoya. Because Bedoya passed this test and did not
appear intoxicated, Northam felt he was capable of driving and
did not ticket him or arrest him. She did suggest that he stop
at a nearby Denny's restaurant and check on his companion, who
looked extremely intoxicated.
 Bedoya also presented the testimony of Firearms Examiner
Richard Fournier. He testified that spent casings are ejected
from the right side of a Glock 22 semiautomatic pistol. This
meant that, had Bedoya been leaning across Koch and shooting out
the passenger window of the car, the spent casings would be
flying into the face of Koch, who was sitting in the passenger
seat.
 Bedoya testified on his own behalf. Though his account of
the evening of May 26, 1994, and morning of May 27, 1994, was
similar to Koch's account, it differed on specific points. 
Because he lived with Koch and they had the same work schedule,
he and Koch were together almost 24 hours a day. From this close
relationship with Koch, Bedoya learned that Koch was an
alcoholic. He said that Koch drank every morning and again when
he got home from work.
 On May 25, 1994, Koch worked, though Bedoya did not. Koch
got home on Thursday morning, May 26, 1994, at about 8 a.m. When
he came home he had a beer and went to bed. Koch woke up around
noon and told Bedoya he would cook dinner later that evening. 
Koch had some beer and some wine and went back to bed until 6
p.m.
 When Koch got up the second time, he cooked dinner. He
began drinking gin and tonic. Bedoya also had some drinks at
this time.
 Around 8 p.m., Koch suggested that they go to Chicago. 
Bedoya agreed. They left in Koch's red Toyota Camry. Once they
arrived in Chicago, their first stop was at Bedoya's uncle's bar,
the Casanova, at 2400 West Lawrence. Bedoya said that he and
Koch had discussed the possibility of opening a fancy nightclub
in Milwaukee that would cater to the Hispanic population. For
this reason, he showed Koch around the bar. While they were at
the Casanova they each had one drink.
 After leaving the Casanova, they went to the Dynasty Lounge,
which is owned by a friend of Bedoya's. Bedoya denied that the
bouncer was at the door when they came in. Inside, however, he
saw a friend, Carlos Varela. He stopped to talk with Varela and
introduced Koch to him. After talking with Varela, Koch and
Bedoya left the Dynasty, planning to look at other Spanish night
clubs.
 When they left the Dynasty, Koch indicated that he wanted to
see Division Street. Bedoya agreed to show him around. As
Bedoya directed Koch where to turn, he pointed out the features
of the different areas. Near the Uptown area, around Broadway
and Lawrence, Koch noticed a number of prostitutes on the street. 
He pulled the car over and struck up a conversation with one of
the prostitutes.
 Koch gave Bedoya his weapon and wallet and got into the back
seat with a prostitute. Bedoya moved over to the driver's seat
and drove away. Very soon after, however, the prostitute told
Bedoya to pull over and she got out. When she left, Koch was
swearing and very angry. Bedoya said Koch was upset because
women didn't like him and he was unable to perform when he was
with a woman.
 Bedoya continued to drive toward Division street, where they
found a bar called Mother's. Inside this bar they were stopped
by the bouncers at the door. Bedoya and Koch informed the
bouncers they were carrying weapons because they were off-duty
police officers. They produced their identification. The
bouncer directed them to one of four bars in the place.
 After ordering some drinks, Koch got up and began to dance
with a couple of girls on the dance floor. When the song ended,
Koch bought himself and the girls some drinks. The girls refused
to accept his drinks, refused to dance with him, and walked away. 
Koch became extremely depressed and angry. He drank all of the
drinks, including the ones he had purchased for the girls, and
became "wasted" or extremely intoxicated. Bedoya decided it was
time to leave, and started for the door. But Koch stopped to
talk with some other girls and ordered more drinks. Koch
appeared to be "bothering" these girls. Johnny "Red" Kerr came
over and said the girls were with him. Bedoya excused himself
and Koch and they left the bar.
 Bedoya denied that he fired his weapon outside Mother's bar. 
He said that he "had more sense" than that. He decided to drive
because Koch was too intoxicated. He drove away from Mother's
bar, intending to go home. In preparation for the long ride
home, he took off his gun and placed it on the seat next to him.
 As Bedoya was driving along, trying to find his way back to
the highway, he heard a shot. He looked over and saw that Koch
was firing out of his passenger window. Bedoya was shocked and
confused by his partner's behavior, but he just drove on. A
short time later he heard more shots. Koch was shooting out of
the window again. This time Bedoya reached over, hit Koch,
grabbed the gun, and brought it inside the car. Bedoya got the
gun away from Koch and threw it on the floor. Then Bedoya drove
off again.
 Koch passed out for a while, but when he woke up he was very
belligerent, hollering about his past wives. Bedoya couldn't
explain why, but he ended up back at the Dynasty Lounge.
 Bedoya and Koch went inside the Dynasty Lounge for the
second time that night. Bedoya said that Koch ordered more
drinks, but he did not remember if he drank anything while he was
there. Bedoya was talking with some friends when he noticed Koch
get up and leave the bar. Bedoya started to follow him outside
when he was grabbed from behind by someone who said, "Police
shit."
 Bedoya said that the person who grabbed him tried to go
after the weapon in his side holster. They began to struggle. 
Bedoya said that the man, whom he later learned was Rodriguez,
kicked Bedoya in the groin. Bedoya fell down. They continued to
struggle over the weapon. Rodriguez was trying to pull the gun
out, Bedoya was trying to keep it in the holster.
 At some point, Rodriguez succeeded in getting the gun out of
the holster. Bedoya said Rodriguez was trying to aim the gun at
him and he was trying to push the gun away. In the struggle, the
gun discharged.
 After the gun discharged, Bedoya was able to regain control
of the weapon. Rodriguez simply walked back to the bar, opened
the door, and went inside. Bedoya said that he did not know that
Rodriguez had been shot.
 Bedoya looked around for Koch to see if he was alright. He
found Koch and said, "Let's get out of here." Bedoya made a
quick stop at the Casanova bar, but then left to go back to
Milwaukee.
 On the way to Milwaukee, he was stopped by a Highland Park
police officer. The officer gave him a field sobriety test,
which he passed. At the officer's suggestion, he went to Denny's
and parked in the back of the parking lot, near a car dealership. 
There he rested for a couple of hours before returning to
Milwaukee. Upon returning to Milwaukee, he and Koch were
arrested in the parking lot of Koch's condo.
 After being instructed and hearing argument, the jury
returned a verdict finding Bedoya guilty of murder, but not
guilty of any of the aggravated discharge of a firearm charges.
DECISION
 The first and controlling issue is whether Bedoya should be
granted a new trial because he was not allowed to introduce
evidence of the victim's past acts of violence. This type of
evidence is referred to as Lynch material because in People v.
Lynch, 104 Ill. 2d 194, 200-01, 470 N.E.2d 1018 (1984), the Court
ruled that "when the theory of self-defense is raised, the
victim's aggressive and violent character is relevant to show who
was the aggressor, and the defendant may show it by appropriate
evidence, regardless of when he learned of it."
 At the close of Beatriz Rodriguez' testimony at trial,
Bedoya's counsel asked for a side bar. Counsel indicated that
the theory of self-defense would be raised and he made an offer
of proof: if he were allowed to inquire of Beatriz, she would
say that in May 1992 Rodriguez beat her while they were living in
Cicero. Counsel indicated that this testimony would be relevant
as "Lynch material."
 The court ruled as follows:
 "No, counsel. I've already made my rulings. We don't need
 to have a side bar for every witness if there's some
 possible Lynch material. And I cannot stand to be
 interrupted because I let everybody talk. I don't want to
 have any more sidebars like this. This is -- there is no
 reason for this."
 Trial continued and defense counsel did not raise the Lynch
matter again until the defense was presenting its case. Defense
counsel asked for a ruling on whether he would be allowed to
present Lynch material. The court asked that case law be
presented the following day regarding the admissibility of this
type of evidence.
 The next day the trial court asked defense counsel to set
out exactly what evidence he intended to present, how self-
defense had been shown, and why the Lynch material should be
admitted.
 Defense counsel explained that he intended to show that on
May 21, 1992, Cicero police officers responded to a domestic
violence call. Beatriz Rodriguez met the officers outside the
home and told the officers that her husband, Jose Julian
Rodriguez, punched her in the head and shoved her across the
room. Beatriz was eight months pregnant at the time.
 Two Cicero police officers approached the Rodriguez home and
were confronted by a very irate Rodriguez, who pointed a gun at
them and told them to "get the fuck off my property or I'll kill
you." Other officers responded and Rodriguez repeatedly
threatened to kill the officers and pointed the gun at them. The
officers fired a shot at Rodriguez and he eventually was
apprehended. Before being placed in handcuffs, Rodriguez
resisted arrest by punching, shoving, and kicking the police
officers. He later was convicted on three counts of aggravated
battery.
 Defense counsel said it was his intention to call the four
Cicero police officers involved in this altercation with
Rodriguez. He also would call Beatriz Rodriguez.
 Counsel argued that the evidence was admissible because it
was relevant on the issue of who was the aggressor. He further
stated that the instruction on self-defense would be offered
because the evidence showed that the shooting occurred during a
fight in which Bedoya was defending himself.
 The State argued against the admission of the evidence,
saying that self-defense was not raised in the "traditional
manner" since Bedoya was arguing both accident and self-defense. 
The State's position was that the Lynch evidence was not relevant
to the case, whether or not the trial court instructed the jury
on self-defense.
 The trial court sustained the State's objection, ruling that
because Bedoya testified the gun went off accidentally, "all
questions of self-defense are out of the case. . . You do not
have the right to bring in the victim's propensity to commit
violent acts if your defense is not that you used deadly force in
defense of yourself or that the gun went off accidentally."
 The resolution of this issue hinges on an understanding of
Lynch. In Lynch, the defendant was charged with murder, and
raised the defense of self-defense. A jury found the defendant
guilty of voluntary manslaughter. Our supreme court decided it
was reversible error for the trial court to exclude evidence that
the victim had three convictions for battery.
 The court said:
 "The convictions were important to the defendant's case,
 however. They might have affected the jury's judgment of
 how credible the various versions of the facts were, and
 they would have helped to complete the picture provided by
 the testimony. This could have affected the decision as to
 whether the defendant acted reasonably under the
 circumstances."
 The court then went on to say that a defense of self-defense
can be supported by evidence of the victim's aggressive and
violent character under two separate sets of circumstances: (1)
where the defendant claims that his own knowledge of the victim's
violent tendencies affected his perceptions and reactions to the
victim's behavior, and (2) to support the defendant's version of
the facts when there is conflicting accounts of what happened. 
Lynch, 104 Ill. 2d at 199-200. In the second situation, which
applies here, it does not matter that the defendant had no prior
knowledge of the victim's violent tendencies. The victim's
character is circumstantial evidence, which may provide the jury
with additional facts to help decide what really happened. 
Lynch, 104 Ill. 2d at 200.
 On appeal, the State contends this is not a self-defense
case, that the trial judge never should have instructed on self-
defense. The State now says to make this a self-defense case
Bedoya would have to admit he pulled the trigger.
 The State's objection to the self-defense instruction is
late. It made no objection at the instructions conference. 
Despite earlier misgivings, the trial judge agreed to instruct
the jury on self-defense. And she did.
 Besides, the State is wrong on the law. The trial judge
correctly instructed the jury on the issue of self-defense. This
was not a pure accident case. Slight evidence of self-defense
will justify an instruction on the issue. People v. Lockett, 82
Ill. 2d 546, 413 N.E.2d 378 (1980). 
 According to Bedoya, the fight began when Rodriguez grabbed
him from behind, saying "Police shit." Bedoya said Rodriguez
kicked him in the groin, knocking him to the ground. Then the
struggle for Bedoya's holstered gun took place. It was
Rodriguez, said the defendant, who pulled the gun out of the
holster.
 Bedoya's claim that the gun fired accidentally during the 
struggle does not eliminate self-defense. The firing of the 
gun might have been an unintended act, but, according to Bedoya,
it happened during a life and death stuggle. Where there is
evidence of self-defense in addition to evidence of accident, the
defendant has the right to rely "on an accident theory as to the
ultimate injury and a self-defense theory as to his preceding
acts." People v. Robinson, 163 Ill. App. 3d 754, 768, 516 N.E.2d
1292 (1987). (Emphasis in original.) Also see People v. Stewart,
143 Ill. App. 3d 933, 494 N.E.2d 1171 (1986).
 Robinson sets out two lines of cases--one where courts
correctly refused to instruct on self-defense, another where the
instruction should have been given. The defining and
distinguishing factor has to do with the presence of facts that
support the defendant's claim he was in a struggle not of his own
making. 
 In Robinson, the defendant had testified he became
frightened by the victim's yelling at him, that he then grabbed
for a shotgun to defend himself, then he struggled over it with a
companion of the victim who had produced it, then the shotgun
fell and accidentally discharged, killing the victim. Those
facts supported the giving of a self-defense instruction. Here,
the case is more compelling where, according to the defendant,
Rodriguez was trying to aim the gun at him when it went off.
 The Supreme Court cited Robinson with approval in People v.
Everette, 141 Ill. 2d 147, 154, 565 N.E.2d 1295 (1990):
 "***the Robinson court correctly observed that
 those decisions which refused to instruct the jury on
 self-defense did so because there was insufficient
 evidence in the record to support the instruction and
 not because there was an inherent or definitional
 contradiction in the defenses."
 In Everette, the Supreme Court said:
 "We, therefore, hold that a homicide defendant
 is entitled to an instruction on self-defense where
 there is some evidence in the record which, if believed
 by a jury, would support the defense, even where the
 defendant testifies he accidentally killed the victim." 
 Everette, 141 Ill. 2d at 156-57.
 The decisions relied on by the State, particularly People v.
Armstrong, 273 Ill. App. 3d 531, 653 N.E.2d 17 (1995), did not
contain factual conflicts concerning who was the aggressor in the
struggle. For that reason, those decisions do not apply to this
case.
 Here, Bedoya claimed throughout the trial that Rodriguez was
the aggressor in their confrontation. No witness, other than the
defendant, saw how it began. The jury had to determine whether
Bedoya's account of the events that led to the shooting was
believable.
 Koch testified that Rodriguez was already fighting with
Bedoya when he left the bar. He tried to intervene in the fight,
but did not even see a gun or who was holding it when it fired.
 The Dynasty bartender, Lopez, testified that he, too, did
not see the initial encounter between Rodriguez and Bedoya. 
However, when he went outside and saw them fighting, he saw the
gun in Bedoya's hand and Rodriguez trying to push it away.
 The evidence regarding who was the initial aggressor was
both "incomplete and conflicting." See Lynch, 104 Ill. 2d at
200. The evidence concerning Rodriguez' prior acts of aggravated
battery, especially because they involved police officers, was
clearly relevant to the issue of who was the first aggressor in
this instance. If the jury believed Rodriguez was the first
aggressor, it would be more likely to believe the gun went off as
Bedoya was defending himself, as he claimed in his testimony.
 The fact that Bedoya was a police officer and Rodriguez
apparently knew this, may have caused jurors to think it less
likely that Rodriguez would attack a police officer or try to
grab for his gun. The fact that two years earlier Rodriguez,
when confronted by four police officers, had threatened them with
a gun and, when apprehended, resisted arrest and kicked the
officers, would have gone a long way to dispel any misconception
that Rodriguez would have been reluctant to attack a police
officer.
 It is clear then, that the trial court was incorrect when it
said that defendant could not advance the theory of both self-
defense and accident. 
 By refusing to admit evidence of the victim's past acts of
violence, the trial court deprived the jury of evidence that
would have assisted it in resolving the question of who was the
initial aggressor and in assessing Bedoya's testimony that the
gun fired accidentally during the confrontation between him and
Rodriguez. Bedoya's defense was that he acted reasonably. See
People v. McGee, 213 Ill. App. 3d 458, 572 N.E.2d 1046 (1991). 
Whether Rodriguez was a violent person was an important and
relevant part of the defense.
 For the reasons stated above, Bedoya's conviction is
reversed and the matter remanded for a new trial.
 Since Bedoya was acquitted of the aggravated discharge of a
firearm charges and cannot be retried on them, Bedoya's new trial
will be on the charge of murder only. It is unnecessary, and we
decline to consider, whether Bedoya was prejudiced by the trial
court's refusal to sever these charges from the murder charge and
have separate trials.
 CONCLUSION
 Because the evidence was adequate to support a guilty
verdict, the error we have found requires that the defendant's
murder conviction be reversed and the cause remanded for a new
trial.
 REVERSED AND REMANDED. 
 CERDA and BURKE, JJ., concur.